**In re Miriam ROWE, Debtor.**

**Miriam ROWE, Plaintiff,**

**v.**

**Anna CONNERS and Edward Sparkman, Standing Trustee, Defendants.**

**Bankruptcy No. 88–13932S.
Adv. No. 89–0782S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 8, 1990.

David A. Searles, Philadelphia, Pa., for debtor.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Nicholas J. Lepore, III, Philadelphia, Pa., for defendants.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Consolidated for trial and disposition before us are a motion of Anna Conners (hereinafter "the Defendant"), the vendor under a contract within the scope of the Pennsylvania Installment Land Contract Law, 68 P.S. § 901, *et seq.* (hereinafter cited as "the ILCL"), in which the Debtor, Miriam Rowe (hereinafter "the Debtor"), is the vendee for the sale of a home at 222 East Allegheny Avenue, Philadelphia, Pennsylvania (hereinafter "the Premises"), to dismiss the Debtor's case or alternatively obtain relief from the automatic stay; and the Debtor's adversary proceeding seeking to reduce the Defendant's filed secured proof of claim in the amount of $22,775.38 to $2,550. As in our prior decisions involving contracts under the ILCL, *In re Capodanno,* 94 B.R. 62 (Bankr.E.D.Pa. 1988); and 83 B.R. 285 (Bankr.E.D.Pa.

1988); and *In re Fox*, 83 B.R. 290 (Bankr. E.D.Pa.1988), we are involved with two sympathetic parties to a homemade agreement requiring legal interpretation to fill its interstices.

Addressing first the Defendant's motion to dismiss this case on the ground that the Debtor's sole source of income—regular contributions from a son over the past five years—is not sufficiently regular and stable to satisfy 11 U.S.C. §§ 109(e), 101(29), we hold that these sections must be read broadly and that dismissal is inappropriate, although the source of income might be a factor in determining feasibility at confirmation. Secondly, we hold that, since the Defendant was obliged to provide a notice and right to cure as required by Act 6 of 1974, 41 P.S. § 101, *et seq.* (hereinafter "Act 6") and failed to do so properly, the Defendant's attempt to declare a forfeiture of the contract fails. Thirdly, we adhere to our holdings in *Fox* and *Capodanno* that a vendee in an ILCL contract may opt to treat the transaction as a secured sale.

However, we agree with the Defendant that not only payments due under the terms of the ILCL contract, but also real estate taxes, past water and sewer bills, and interest at six (6%) percent from the date of termination of the contract under its own terms in January, 1984, to the date of confirmation, and probably thereafter pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), are due to the Defendant. We also reject the Debtor's claim against the Defendant for malicious prosecution because we believe that her actions against the Debtor were not motivated by any improper purpose. As a result of these holdings, we fix the Defendant's secured claim at $7,165 and, since she has presumably only paid $47 monthly, or $658 in the first 14 months of her case, project that the Debtor must pay at least $180 monthly for the remaining maximum 46–month plan to propose a feasible plan, requiring a considerable upward adjustment to her present plan payments. As this figure approaches the $200 monthly which the Debtor receives from her son, we have serious doubts regarding the feasibility of any plan which the Debtor could propose. We will give her only until February 22, 1990, to propose an amended plan; reschedule the date of the final confirmation hearing on March 6, 1990; and continue the Defendant's motion for relief from the automatic stay until that date.

## B. PROCEDURAL HISTORY

The Debtor filed the underlying voluntary Chapter 13 bankruptcy case on November 8, 1988. The initial matter of substance in this case was a motion of the Debtor, filed January 19, 1989, to strike a state court judgment granting the Defendant possession of the Premises which had been entered post-petition, and to hold the Defendant in contempt of court for refusing to agree to strike the judgment. Ultimately, by a Stipulation approved by us on March 6, 1989, the Defendant agreed to strike the judgment and the Debtor agreed to withdraw her motion.

The next filing relating to the relationship between the parties, on June 19, 1989, was curiously oblique: an objection by the Defendant to the Debtor's attempt to claim an exemption in the Premises, based on the Defendant's contention that the Debtor's interest in the Premises had terminated. This matter has never been resolved, but was continued to the date of the other matters in issue here, and will be disposed of herein.

On June 26, 1989, the Defendant filed the motion to dismiss or seek relief from the automatic stay which is before us. The hearing on this motion was ultimately continued to the date of the trial of the instant adversary proceeding, October 24, 1989.

The adversary proceeding in issue was filed on August 29, 1989. In addition to attempting to reduce the Defendant's allowed secured claim to $2,550, the Debtor also alleged a claim for $400 damages for malicious prosecution against the Defendant in the form of a counterclaim to a proof of claim, thus seeking to further reduce the Defendant's claim to $2,150.

A brief trial was conducted on October 24, 1989. The Defendant indicated a desire to order the Transcript prior to briefing. After completion of the Transcript, simulta-

neous filing of proposed Findings of Fact, proposed Conclusions of Law, and initial Briefs; and Reply Briefs were set for December 22, 1989, and December 29, 1989, respectively. The Debtor's counsel requested an extension of these time periods to January 15, 1990, and January 22, 1990, respectively. The Debtor submitted her reply in slightly tardy fashion on January 24, 1990.

We should also note that, on December 15, 1989, and again on January 12, 1990, we scheduled these matters for settlement conferences before the Honorable William H. Gindin of the District of New Jersey, who has appeared as a "visiting judge" to assist this court with its large caseload. Settlement did not, however, occur, rendering formulation of this Opinion necessary. Because the matters at hand include an adversary proceeding, we are obliged, pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), to submit our decision in the form of Findings of Fact and Conclusions of Law. The Conclusions of Law are embraced within discussions of the relevant legal authorities.

## C. FINDINGS OF FACT

1. The Defendant, as trustee for her daughter, Katherine Conners, is record owner of legal title to the Premises.

2. On June 1, 1979, and June 5, 1979, the Defendant executed two similar, home-made "Agreements of Sale" of the Premises to the Debtor, a widow, and the late Rev. Oscar H. Rowe, her husband (hereinafter "the Rowes"). By the terms of the Agreement, the Premises was sold to the Rowes for $7,000, payable on terms of $125 at signing and $125 monthly thereafter. No interest payments were required. The June 1, 1979, agreement, which the Defendant contends and the Debtor testified (due to its notarization) was operative, required the buyers to pay "all repairs & payments of utilities;" by way of contrast, the second agreement required them to pay "all cost of maintenance & repairs" to the Premises. The second agreement, but not the first agreement, states that it is "Effective as of Sept.–1979."

3. The Defendant produced individual receipts and a ledger, the accuracy of which the Debtor·did not contest at trial, showing that payments of $125 each were made June 17, 1979; October, November, and December, 1979; payments totalling $1,200 (as opposed to the $1,500 due) were made in 1980; payments of $125 were made in January through April, 1981, and in September, 1982; and $2,000 was paid on March 17, 1981. Thus, although the payment in March, 1981, put the Rowes over $1,000 ahead in payments, they fell behind as of early 1982 and have only ever paid $4,325.00 towards the purchase balance.

4. The Rowes initially did not pay any water and sewer, insurance, and taxes falling due during the period of their possession of the Premises. The Defendant paid all of these charges until 1982, at which time the Rowes began paying their own water and sewer charges. In 1989, the Debtor agreed to begin paying the insurance, and the Defendant is not pressing a claim for reimbursement for payments of insurance in the past. The parties agree that the taxes paid by the Defendant total $2,998.63, and water and sewer bills paid by the Defendant total $528.37.

5. On June 23, 1981, the Defendant sent a letter to the Rowes in which she claimed that they breached agreements to settle as of September, 1979, and September, 1980; requested that settlement be made by July 1, 1981; and threatened to add fifteen (15%) percent on all monies owed if the Rowes did not agree to settle on that date. She also demanded payment of insurance, real estate taxes and interest from June, 1979, and claimed that $4,477.55 would be due as of July 1, 1981.

6. On July 22, 1981, the Defendant mailed to the Rowes a letter dated July 21, 1981, requesting that the Rowes vacate the property within 15 days. On July 31, 1981, the Defendant then filed a *pro se* landlord-tenant eviction complaint against the Rowes in the Philadelphia Municipal Court (hereinafter "PMC"), which was dismissed by court on the ground that the PMC lacked jurisdiction over eviction actions pursuant to installment land sale contracts.

7. In late 1982 or 1983, the Rowes paid an additional sum of $500.00 to the Defendant, which the Defendant returned under cover of a letter of March 20, 1983, which also enclosed an "Amendment" to the parties' agreements of 1979, purporting, *inter alia*, to raise the price to $10,201.75 and include payment of interest at thirteen (13%) percent per annum.

8. On June 2, 1983, I. Harry Checchio, representing the Defendant, sent a certified letter to the Rowes stating that they were in default in the sum of $4,049.64 ($1,275 in payments, $1,227.39 in taxes, $581.25 in water and sewer charges, and $866 for fire insurance) and threatened that, if this sum were not paid in 32 days, proceedings to evict them would begin. No recitation of a right to cure the default after the 32–day period was included therein.

9. On November 8, 1984, Mr. Checchio sent another certified letter to the Debtor, stating that, due to their failure to be present "on the settlement date of May 2, 1983 [a date not elsewhere referenced]," they were to pay the full balance due and vacate the premises within 30 days.

10. When the Debtor did not pay or vacate the Premises, the Defendant, in March, 1985, commenced a second *pro se* landlord-tenant eviction complaint against the Debtor in PMC.

11. Although represented by a private attorney, to whom she paid a $400.00 fee, the Debtor lost this case, but, on appeal to the Philadelphia Court of Common Pleas (hereinafter "Phila.C.P.") by her present free legal services program counsel, the judgment was stricken on October 17, 1985.

12. In May, 1986, the Defendant commenced a civil action in the proper forum, the Phila.C.P. She obtained a summary judgment in that action on November 28, 1988, only after the filing of this bankruptcy case, which was stricken pursuant to the Stipulation approved by us on March 6, 1989.

13. The parties stipulated that the present value of the Premises is $11,500. The Defendant testified that, when she last visited the Premises in 1983, she noticed panelling and other improvements had been made to the Premises by the Rowes, and that she believed that a fair rental for the Premises since that date would be at least $250 monthly.

14. The Debtor, on December 22, 1988, filed a Plan of Reorganization contemplating payments to the trustee in the amount of $47.00 per month for sixty (60) months.

15. The Debtor's Chapter 13 Statement, admitted into the record by agreement, includes a Budget reciting, as her sole source of income, contributions to her of $200 monthly from her son, Mark Rowe, and total monthly expenses of $149.

16. The Debtor testified that her son Mark, who owns a window-sale business, had regularly paid her the $200 monthly to her since her husband died in 1984 and could increase these payments and pay the real estate taxes and insurance if she were required to make these payments.

17. The Debtor included, in her Chapter 13 Statement, a $3,200 loan to her son Mark for windows for the Premises which she testified that she did not expect to have to repay.

18. The Defendant filed a Proof of Claim on August 15, 1989, including the following components:

| | |
|---|---|
| Balance under Agreement | $ 2,675.00 |
| Interest from July 4, 1983 (date of alleged termination of Agreement until petition date) at 6% per annum | 858.82 |
| Water and sewer bills paid by Defendant | 528.37 |
| Taxes paid by Defendant | 2,713.19 |
| Rent from May 1, 1984 (alleged date of last payment under the Agreement) to petition date at $250 per month | 13,750.00 |
| Post petition rentals through August 9, 1989 | 2,250.00 |
| TOTAL | $22,775.38 |

19. The adversarial Complaint objects to this Proof of Claim and alleges that all that is due is $2,550, which the Debtor alleges is the balance due under the Agreement. In addition, it recites a counterclaim in malicious prosecution against the Defendant to recover the $400 fee paid to her

private attorney to defend the second PMC action, which would reduce the Defendant's claim to $2,150.

## D. CONCLUSIONS OF LAW/DISCUSSION

1. *The Debtor's Consistent, Long-standing Receipt of a $200 Monthly Contribution from her son Qualifies her for Chapter 13 as an "Individual with Regular Income" and there are no Other Impediments to the Debtor's Eligibility for Filing Under Chapter 13.*

■ We shall first discuss the issue raised in the Defendant's motion to dismiss, *i.e.,* whether the Debtor is eligible for Chapter 13 due to the fact that, admittedly, her sole source of income is a voluntary contribution of $200 monthly from her son, Mark Rowe.[1] If this issue were resolved favorably to the Defendant, we would, without deliberation of other issues, dismiss the case and the adversary proceeding.

The Code provides that "[o]nly an individual with regular income ... may be a debtor under Chapter 13 of this title." 11 U.S.C. § 109(e). The definition of an eligible individual is further fleshed out by 11 U.S.C. § 101(29), which provides as follows:

(29) "individual with regular income" means individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title, other than a stockbroker or a commodity broker;

The language of 11 U.S.C. § 101(29) is intended to be much broader than the language of Chapter XIII of the predecessor Bankruptcy Act, which limited eligibility to "wage earners." 2 COLLIER ON BANKRUPTCY, ¶ 101.29, at 101–66 to 101–68 (15th ed. 1989). The Congressional Reports pertinent to this definition state as follows and indicate, in the passages emphasized, an intention to make the term as broad as possible with virtually no exemp-

tions except an exclusion, irrelevant here, of certain brokers:

The effect of this definition, and of its use in section 109(e), is *to expand substantially the kinds of individuals that are eligible for relief under chapter 13,* Adjustment of Debts of an Individual with Regular Income. Chapter XIII is now available only for wage earners. The definition encompasses *all individuals with incomes that are sufficiently stable and regular to enable them to make payments under a chapter 13 plan.* Thus, individuals on welfare, social security, fixed pension incomes, or who live on investment incomes, will be able to work out repayment plans with their creditors rather than being forced into straight bankruptcy. Also, self-employed individuals will be eligible to use chapter 13 if they have regular incomes (emphasis added).

S.REP. NO. 989, 95th Cong., 2d Sess. 24 (1978); and H.R.REP. NO. 595, 95th Cong., 2nd Sess. 311–12 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5810, 6268–69. As we read this legislative history, the goal in drafting the definition of § 101(29) appears to have been to simply eliminate the restrictions on the definition of wage earner in Chapter XIII and, by making the language as inclusive as possible, render any individual with any sort of regular income eligible for Chapter 13.

The Defendant has located most of the small body of cases in which courts have held certain individuals ineligible for Chapter 13 because their income was not deemed sufficiently "stable and regular" to allow the debtor to be eligible for Chapter 13, *e.g., In re Sassower,* 76 B.R. 957 (Bankr.S.D.N.Y.1987) (debtor was a disbarred attorney planning to get financial support from his mother and children and the proceeds of a book on the subject of judicial corruption); and *In re Cregut,* 69 B.R. 21 (Bankr.D.Ariz.1986) (debtor was a college student getting contributions from his father, who filed Chapter 13 to dis-

---

**1.** The budget contained in the Debtor's Chapter 13 Statement also listed energy assistance of $550 per year as income. However, the Debtor testified that such assistance must be applied directly to utility bills, and therefore we do not consider this benefit as income.

charge a debt arising from a negligent homicide). *See also In re Hickman,* 104 B.R. 374 (Bankr.D.Colo.1989) (debtor employed seasonally as a sprinkler-system installer who did odd jobs in the off-season found ineligible for Chapter 13). The argument made by the Defendant is that, although regular receipt of even public benefits satisfies the § 101(29) definition, *see In re Zawisza,* 73 B.R. 929, 934–35 (Bankr.E.D.Pa.1987), the Debtor's receipt of gratuitous payments from her son is not sufficiently reliable to constitute regular income.

These cases are countered by a larger body of cases which interpret § 101(29) more broadly. In *In re Cole,* 3 B.R. 346, 348–49 (Bankr.S.D.W.Va.1980), the court holds, contrary to *Hickman,* that income received by a debtor from performance of odd jobs is sufficient to meet the § 101(29) definition. In *In re LeMaire,* 883 F.2d 1373, 1381 (8th Cir.1989), in contrast to *Cregut,* the court holds that income from a fellowship is sufficiently regular to qualify a student-debtor for Chapter 13.

More to the point are the growing body of cases holding that unemployed persons married to employed spouses meet the § 101(29) definition. *See In re McLeroy,* 106 B.R. 147 (Bankr.W.D.Tenn.1989); *In re Estalella,* 101 B.R. 391 (Bankr.S.D.Fla. 1989); *In re Varian,* 91 B.R. 653 (Bankr.D. Conn.1988); *In re Ellenburg,* 89 B.R. 258 (Bankr.N.D.Ga.1988); and *In re Cohen,* 13 B.R. 350, 356–57 (Bankr.E.D.N.Y.1981).

The Defendant might be able to distinguish the cases cited in the last paragraph on the ground that the employed spouse had a legal obligation to support the unemployed debtors, while the Debtor's son has no legal duty to support her. However, the court, in *Cohen,* expressly includes payments due purely to "the generosity of a close relative," *id.* at 356, in the category of stable and regular income. *Accord, In re Campbell,* 38 B.R. 193, 195–96 (Bankr.E.D.N.Y.1984) (although court disapproves dictum in *Cohen* that any relative's generosity would satisfy § 101(29) definition, court finds such sources are sufficient when the relatives are jointly liable with the debtor on his debts). *Cf. In re Cheatham,* 91 B.R. 377, 380–81 (E.D.N.C.1988) (plan determined to be feasible even though Chapter 11 farmer-debtor's sole source of income was from his family).

We therefore conclude that the Debtor's receipt of $200 from her son is an acceptable source of "stable and regular" income to qualify the Debtor for Chapter 13 relief. We note that the five-year duration of these payments would appear to render them "stable and regular" within the ordinary meaning of those terms. It would be unfairly and possible unconstitutionally discriminatory to disqualify the debtor as a Chapter 13 participant solely because her income is modest. *Compare Zawisza, supra,* 73 B.R. at 934.

█ There is of course a requirement that any Chapter 13 plan filed be feasible. 11 U.S.C. § 1325(a)(6). If the Debtor's sources of income are insufficient to make necessary plan payments, and that *is* a legitimate concern here, *see* pages 729–730 *infra,* then the Plan will not be confirmable for that reason. However, we disagree with that small body of cases which refuse to allow a Chapter 13 debtor to even make an attempt to propose a feasible plan because of the absence of a particular source of income which a court might deem sufficient "stable and regular." In sum, we disagree with the results in *Sassower, Cregut,* and *Hickman.* It appears that the *Sassower* and *Cregut* courts were searching for convenient means to dispose of the cases of debtors repulsive to them, which injects unwritten and therefore we believe improper elements into the Chapter 13 eligibility equation.

█ More misguided is the Defendant's related allegation that the Debtor's inclusion of her doubtful $3,200 indebtedness to her son for the purchase of windows constitutes a proposal of her plan in bad faith in violation of 11 U.S.C. § 1325(a)(3) within the rigorous description of the circumstances for a showing that a plan has not been proposed in good faith, *i.e.,* making fraudulent misrepresentation or serious *nondisclosures* of material facts, set forth in *In*

*re Gathright,* 67 B.R. 384, 387–88 (Bankr. E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987). A Chapter 13 debtor is obliged to file a complete list of all known creditors. 11 U.S.C. § 521(1). *See Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 416–17 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). *Omission* of any known potential indebtednesses, including family debts like that possibly owed by the Debtor to her son, might constitute bad faith. *Inclusion* of this indebtedness is hence surely *not* a badge of bad faith.

There is, then, no just basis for excluding the Debtor from the protection of Chapter 13. We must proceed to discuss the other issues presented by these matters.

   2. *In Light of the Disfavor of Forfeitures In the Law, the Defendant's Dispatch of two Letters, not in Strict Compliance with Act No. 6 of 1974, Which Make Unjustified Demands as Conditions to Avoid Termination of the Parties' Agreement, were Insufficient to so Terminate the Agreement.*

The second and a somewhat more difficult threshold for the Debtor to clear to utilize this bankruptcy case to retain the Premises as her home is fending off the Defendant's claim that one or both of the two letters sent to the Debtor by her former counsel, I. Harry Checchio, *see* Findings of Fact 8 and 9, page 716 *supra,* validly terminated whatever rights she had under the Agreement pursuant to the requirements of ILCL. The ILCL provides, at 68 P.S. § 904, that a contract within its scope, which the parties apparently agree is the case as to the instant Agreement, can be terminated thusly:

   § 904. Notice to terminate contract upon purchaser's default.

   (a) Whenever default is made in the terms or conditions of any installment land contract by reason of which default the seller has the right to terminate the contract, the seller shall as a condition precedent to the exercise of the right serve upon the purchaser a written notice of termination. The notice shall be served personally by registered mail or by certified mail sent to the last known address of the purchaser.

   (b) The notice shall specify the nature of the default and whenever the default arises out of the purchaser's failure to keep the premises in good repair pursuant to the provisions of the installment land contract, the notice shall contain a reasonably specific statement of the items in disrepair.

   (c) The date of termination specified in the notice shall in no case be less than thirty days after the date upon which service of the notice is made upon the purchaser, in the manner hereinbefore provided, where default is because of failure to make payment when due. Whenever default arises because of purchaser's failure to make repairs, the notice shall be no less than sixty days.

As in *In re C & C TV & Appliance, Inc.,* 97 B.R. 782, 786 (Bankr.E.D.Pa.), *aff'd,* 103 B.R. 590 (E.D.Pa.1989),

   [t]he starting point of our analysis is the body of law, cited by us in *In re Sudler,* 71 B.R. 780, 785 (Bankr.E.D.Pa. 1987),

      "which has termed forfeitures as 'odious,' *Arcon Development Corp. v. United States,* 409 F.Supp. 671, 673 (W.D.Pa.1976); 'disfavored,' *Barraclough v. Atlantic Refining Co.,* 230 Pa.Super. 276, 281, 326 A.2d 477, 479 (1974); and 'abhorrent,' *In re Kam Dam Marina, Inc.,* 20 B.R. 414, 416 (Bankr.W.D.Pa.1982); and *Jackson v. Richards 5 & 10, Inc.,* 289 Pa.Super. 445, 452, 433 A.2d 888, 892 (1981)."

In *C & C,* we carefully analyzed the content and mode of dispatch of the letters of the debtor's landlord which purportedly effected a pre-petition termination of the parties' lease. *Id.* at 786–87. Finding the requisite "strict conformity" with the prerequisites in the lease necessary to terminate it lacking, we concluded that the lease in issue there had not been terminated. *Id.*

We then went on to reason that the landlord's unilateral claim that the lease was terminated was not, as a matter of law,

sufficient to effect a termination. *Id.* at 788. Consequently, we concluded that due process of law required that the landlord obtain a final court determination or the tenant take some act totally inconsistent with retention of the leasehold pre-petition, or a lease could not be deemed terminated. *Id.*

The district affirmed our decision on the first ground articulated above only. It agreed that forfeitures were strongly disfavored under Pennsylvania law, that strict conformity of the lease-termination prerequisites was necessary to terminate the lease, and that the landlord had not strictly complied with the prerequisites in the lease for termination. 103 B.R. at 592–93. However, in the last sentence of the Opinion, the district court stated that it did not adopt that part of our analysis "which relates to the termination of leases pursuant only to judicial proceedings." *Id.* at 593.

The Debtor argues that, in addition to satisfying the requirements of 68 P.S. § 904, the Defendant was obliged to dispatch a notice in compliance with the requirements of Act 6 before she could terminate the parties' contract. Although our original impression, expressed at the close of the trial, was that Act 6 would come into play only at the point that the Defendant attempted to actually evict the Debtor, as opposed to the point where she merely sought to terminate the ILCL contract, we are compelled, on further reflection, to reassess that position and conclude that the Debtor is correct in her assertion that a notice of termination of the ILCL contract must comply with not only 68 P.S. § 904 of the ILCL, but also 41 P.S. § 403(c) of Act 6.

In *Anderson Contracting Co. v. Daugherty*, 274 Pa.Super. 13, 20–23, 417 A.2d 1227, 1230–32 (1979), the Pennsylvania Superior Court held that Act 6 applies to installment land-sale contracts generally and contracts within the scope of the ILCL in particular. The proceedings in the *Anderson* case involved the entry of a confessed judgment against the buyer, at the time of a prior, subsequently-cured default which the sellers apparently attempted to enforce by execution at the time of a subse-

quent default. Therefore, the sole issue before the court seemed to be whether the buyers were entitled to cure a default subsequent to the entry of the confessed judgment pursuant to 41 P.S. § 404(a) of Act 6, which provides that any default in a "residential mortgage obligation" may be cured "at any time at least one hour prior to the commencement of bidding at a sheriff's sale" of the obligor's interest in the residence. In holding that Act 6 applies to ILCL transactions generally, the court did not focus on whether the provisions of 41 P.S. § 403 superseded or supplemented those of 68 P.S. § 904. In a footnote, the court expressly states that whether there is a conflict in these provisions is not before it, while suggesting that, if there would be a conflict, the later statute (Act 6) would prevail. 274 Pa.Super. at 17 n. 1, 417 A.2d at 1229 n. 1.

We believe that the conclusion that 41 P.S. §§ 403(c) and 404(a) apply to ILCL contracts is inescapable in light of *Anderson*. The notice and cure provision of Act 6 arise whenever a lender seeks to "accelerate the maturity of any residential mortgage obligation," as well as whenever the lender seeks to commence an action to enforce its rights under the obligation or take possession of the secured residence. 41 P.S. § 403(a). In an ILCL or installment-land sale transaction, termination is comparable to and, if anything, more final in forfeiting the obligor's right to possession of the premises than is the acceleration of a mortgage. Thus, we accurately stated in *Fox, supra*, 83 B.R. at 297, though without the benefit of the foregoing analysis, that " 'notice of intention to foreclose' ... must be dispatched to a vendee under an installment land sale contract before the vendee's rights could be terminated."

We further opine that there is no conflict between 41 P.S. §§ 403(c) and 404 of Act 6 and 68 P.S. § 904 of the ILCL. 41 P.S. § 404 provides a right to cure as follows:

§ 404. Right to cure a default

(a) Notwithstanding the provisions of any other law, after a notice of intention to foreclose has been given pursuant to

section 403 of this act, at any time at least one hour prior to the commencement of bidding at a sheriff sale or other judicial sale on a residential mortgage obligation, the residential mortgage debtor or anyone in his behalf, not more than three times in any calendar year, may cure his default and prevent sale or other disposition of the real estate and avoid acceleration, if any, by tendering the amount or performance specified in subsection (b) of this section.

(b) To cure a default under this section, a residential mortgage debtor shall:

(1) Pay or tender in the form of cash, cashier's check or certified check, all sums which would have been due at the time of payment or tender in the absence of default and the exercise of an acceleration clause, if any;

(2) Perform any other obligation which he would have been bound to perform in the absence of default or the exercise of an acceleration clause, if any;

(3) Pay or tender any reasonable fees allowed under section 406 and the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment.

(4) Pay any reasonable late penalty, if provided for in the security document.

(c) Cure of a default pursuant to this section restores the residential mortgage debtor to the same position as if the default had not occurred.

41 P.S. § 403(c) requires that a "notice of intention to foreclose" provide as follows:

(c) The written notice shall clearly and conspicuously state:

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default as provided in section 404 of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;

(4) The time within which the debtor must cure the default;

(5) The method or methods by which the debtor's ownership or possession of the real estate may be terminated; and

(6) The right of the debtor, if any, to transfer the real estate to another person subject to the security interest or to refinance the obligation and of the transferee's right, if any, to cure the default.

■ The notice requirements set forth in these statutory provisions are supplemental to, but not inconsistent with, the notice requirements set forth in 68 P.S. § 904. This does not place the statutes in conflict, but merely requires the vendor in an installment land sale contract to comply with the cumulative requirements of both laws before terminating the vendee's rights under such a contract. *Cf. Culbreth v. Lawrence J. Miller, Inc.*, 328 Pa.Super. 374, 388–89, 477 A.2d 491, 499 (1984) (provisions of a Pennsylvania statutory provision pertaining to rescission of a door-to-door sale applies to public insurance adjustors despite the presence of a Regulation pertaining strictly to rescission of public insurance adjustor contracts).

Having concluded that the Defendant was obliged to comply with 41 P.S. §§ 403(c) and 404 of Act 6 as well as 68 P.S. § 904 of the ILCL before she could declare the Debtor's rights in the Premises terminated, we must now examine the letters sent by Mr. Checchio on June 2, 1983, and November 8, 1984, to determine whether they meet the requirements of both of these laws. As we observed in *In re Mosley*, 85 B.R. 942, 951 (Bankr.E.D.Pa.1988), "[t]he strong Pennsylvania policy of preventing forfeitures, ..." *see* page 719 *supra*, "and minimizing injustice to consumers through foreclosure on their homes, ... is served by a strict construction of Act 6, ..."

■ There are two rather glaring respects in which the letter of June 2, 1983, fails to comply with § 403(c). First, it inaccurately ignores the annexation of the

right to cure which § 404(a) effectively adds to the parties' agreement. It is therefore *not* true, as the letter states, that the Rowes had but 32 days in which to cure their default. By force of § 404(a), they had until the installment land sale contract analogue of one hour before a sheriff's sale to effect a cure. Since the vendor in an ILCL transaction remains in title, and no sheriff's sale is necessary, the right to cure an installment land sale contract presumably extends until one hour before the vendee's interests are cut off. This would not occur, in our view, until there is a court judgment terminating the vendee's rights in the property subject to the ILCL contract. As a result, the letter fails to accurately set forth the time in which the default must be cured, as required by § 403(c)(4), or the performance necessary to cure a default, as required by 41 P.S. § 403(c)(3).

■ Secondly, the letter, without any legal basis to do so, demands that the Rowes reimburse the Defendant for $866.00 expended by her in purchasing fire insurance for the Premises. Although the Defendant's demands set forth in her Proof of Claim, *see* Finding of Fact 18, page 716 *supra*, state her best case scenario, even there (and in her present vigorous and very competent briefing), the Defendant does not demand reimbursement for these costs. By thus including a demand for charges to which the Defendant is rather obviously not entitled, the letter of June 2, 1983, violates § 403(c)(2) by misstating the nature of the default and misstating the exact performance which the Rowes must render to cure the default.

Also, the letter fails to describe, in any sense whatsoever, how the Rowes' possession of the Premises can be terminated. Obviously an action in Phila.C.P., as opposed to a landlord-tenant proceeding in PMC, is necessary. This constitutes a violation of § 403(c)(5).

As we stated in *In re Miller*, 90 B.R. 762, 768 (Bankr.E.D.Pa.1988), the requirements of §§ 403(c)(2) and (c)(3) are the most important elements of an Act 6 notice. Shortcomings on disclosure of these elements cannot be rationalized as technical or trivial. Especially in the context of a relationship with a vendor who was prone to altering the parties' relationship unilaterally, *See* Findings of Fact 5–7 and 9 at pages 715 and 716, *supra*, it was vital that these elements be accurately disclosed.

We note that the inaccuracies in the June 2, 1983, letter in reciting "the nature of the default" renders this letter violative of 68 P.S. § 904(b) as well. Therefore, even if we concluded that Act 6 does not apply to the instant setting of an ILCL contract, we would be compelled to conclude that the Defendant has not strictly complied with the prerequisites for termination of the agreement, as in *C & C, supra*.

We need devote little attention to the letter of November 8, 1984. The defaults alleged therein are a totally unspecified failure to make payments and a failure to be present at a settlement of May 2, 1983, which finds no reference point in the parties' agreement. This letter is therefore grossly deficient in making disclosures required by 41 P.S. §§ 403(c)(2), (c)(3), (c)(4), and (c)(5). It also fails, even more dramatically than the predecessor-letter, to accurately specify the Debtor's default, in violation of 68 P.S. § 904(b) of the ILCL.

Again, in light of the disfavor of the forfeitures in the law, it is clear that the Defendant has not adhered to the first prong of the requirements set forth in *C & C*, *i.e.*, she failed to strictly conform to the prerequisites necessary to effect the agreement's termination under the terms of the applicable law. We therefore need not reach the second prong of the *C & C* requirements, *i.e.*, that the Defendant failed to obtain a court adjudication of the termination of the agreement pre-petition in order to conclude that the Defendant has not validly terminated the parties' agreement.

3. *The Debtor may Legitimately Treat the Parties' Agreement as a Secured Sale of the Premises Rather Than as an Executory Lease Contract.*

■ In *Fox, supra*, we held, after a rigorous analysis which involved numerous

consideration of Pennsylvania state law and what we ultimately deemed to be controlling federal bankruptcy law, 83 B.R. at 295–302, that a debtor who is a vendee in a Pennsylvania installment land sale contract

> is empowered to avoid the choice of unconditionally accepting or rejecting this Agreement, as she would be required to do were the Agreement deemed to be an executory contract, and conclude that she may exercise an option to treat the Agreement like a secured transaction.

We acknowledge, as we did in *Fox*, that numerous decisions, "almost equal" in number to those supporting our conclusion that such contracts could be treated by debtor-vendees as security devices instead of executory contracts, hold to the contrary. 83 B.R. at 296. The conflicts in the caselaw persist, *compare Terrell v. Albaugh*, 892 F.2d 469 (6th Cir.1989) (installment land sale-contract is an executory contract), *with In re Streets & Beard Farm Partnership*, 882 F.2d 233 (7th Cir. 1989) (such a contract is a security agreement), and may be to some degree explained by the difference in treatment of such contracts among the laws of the various states.

The Defendant argues that our *Fox* result was dictated by the particular equities served to both parties by our decision, *i.e.*, the extrication of the Debtor from an onerous contract and the extrication of the vendor from the "slumlord's dilemma." 83 B.R. at 299. However, our ruling there rested on many considerations apart from the particular equities of the parties involved in that particular dispute. This was illustrated in our application of the *Fox* decision in *Capodanno*, where we found that equities of the debtors were in many respects wanting relative to those of the vendors. *See* 94 B.R. at 63–64, 67–68; and 83 B.R. at 289. The transaction there was eminently fair, "if anything, a bargain," for the Debtors. *Id.* at 286.

In sum, we adhere to *Fox* and to *Capodanno*, and the Debtor here, not an unsympathetic figure as the aging widow of a minister, will be granted the right to treat her installment land sale contract as a secured transaction.

4. *The Debtor may be Permitted to Cure her Obligations to the Defendant in her Chapter 13 Plan, Despite the Fact that the Term of the Contract Expired in 1984.*

An issue raised here which has, like the treatment of installment land sale contracts, resulted in a split of authority among the courts, is whether a debtor may utilize a Chapter 13 plan to liquidate an obligation which matured prior to the debtor's bankruptcy filing. This is, however, an issue which technically relates only to confirmation and it would appear to be premature to decide this issue at this juncture. *Compare In re Jablonski*, 88 B.R. 652, 657–57 (E.D.Pa.1988).[2]

The Defendant contends that the issue of whether the Debtor's plan is confirmable is relevant to her § 362(d) motion at this juncture. The Defendant relies solely upon § 362(d)(2), as opposed to § 362(d)(1), to support the relief from the automatic stay which she seeks. In this regard, the Defendant posits that a finding that the Debtor could not propose a confirmable plan to cure the delinquencies on her obligation to the Defendant will allow the Defendant to satisfy the second prong of 11 U.S.C. § 362(d)(2), *i.e.*, § 362(d)(2)(B). *See, e.g., In re Mitchell*, 75 B.R. 593, 598–600 (Bankr.E.D.Pa.1987); and *In re Crompton*, 73 B.R. 800, 811–12 (Bankr.E.D.Pa.1987). Of course, § 362(d)(2) is stated in the conjunctive. It is not readily apparent, as it was in *Mitchell, supra,* 75 B.R. at 598; and *Crompton, supra,* 73 B.R. at 811, that the Debtor lacks equity in the Premises, and hence that the first prong of § 362(d)(2), *i.e.*, § 362(d)(2)(A), can be satisfied here.

---

**2.** The same is true of the Defendant's contention that the Debtor's Plan violates 11 U.S.C. § 1322(c). *But see Capodanno, supra,* 94 B.R. at 66–67 (leave to extend a plan to sixty (60) months should be freely given). For that reason, this issue is not further discussed at this time.

The Defendant skims over this difficulty by observing that her $22,775.38 secured claim is far in excess of the $11,500 value of the Premises. The problem with this observation is that this court, in this Opinion, proceeds to determine the Defendant's secured claim at $7,165, *see* pages 724–28 *infra*, a figure far less than the $11,500 value of the Premises. Since we find that the Defendant's claim is comfortably oversecured, the requirement of § 362(d)(2)(A) is not met, and any further discussion of § 362(d)(2)(B) is academic.

Furthermore, if we were compelled to reach the issue, we note that we have twice suggested that we believe that an obligation which matures before a bankruptcy filing may be cured in a Chapter 13 plan. *See In re Klein,* 106 B.R. 396, 402–04 (Bankr.E.D.Pa.1989); and *In re Ford,* 84 B.R. 40, 43–44 (Bankr.E.D.Pa.1988). While we have readily acknowledged authority to the contrary, including *In re Halley,* 70 B.R. 283, 285 (E.D.Pa.1987), we have also observed that the subsequent analysis imparted in *In re Roach,* 824 F.2d 1370, 1374–77 (3d Cir.1987), clearly holding that a "cure" is not a "modification" of a secured obligation, suggests that 11 U.S.C. § 1322(b)(2) is not a bar to confirmation of a plan featuring a cure of an obligation which matured prior to a bankruptcy filing. As the Defendant notes, 11 U.S.C. § 1322(b)(5), relating to obligations which mature after the plan payments are completed, is clearly inapplicable. We cannot agree, however, with the Defendant's off-hand and unsupported statement that 11 U.S.C. § 1322(b)(3) is inapplicable. That Code section provides for the curing of *any* default. *See Klein, supra,* 106 B.R. at 404; and *Ford, supra,* 84 B.R. at 43–44. It would seem to embrace a default which matured pre-petition as well as any other.

■ In summary, we believe that a debtor can cure an obligation which has matured pre-petition in a Chapter 13 plan. We note that the Defendant will not suffer any significant detriment as a result of this holding. Since the Defendant is oversecured, she will receive payments of interest through the date of confirmation of the Debtor's Plan. *See Klein, supra,* 106 B.R. at 402 & n. 7. *See also In re Szostek,* 886 F.2d 1405, 1410–13 (3d Cir.1989) (if and only if voluntarily included in a plan or demanded by a secured creditor by means of objections to a plan will interest be allowed to the secured creditor after confirmation under 11 U.S.C. § 1325(a)(5)(B)(ii)).

We are therefore unwilling to declare the Debtor's prospects for preparing a confirmable plan to be doomed on the ground that her obligation to the Defendant matured pre-petition. Having effectively concluded that the Defendant cannot short-circuit the Debtor's right to prepare a plan to cure the valid secured claim of the Defendant, we must now address the proper measurement of that secured claim.

5. *The Defendant is Entitled to a Secured Claim of $7,165, Including a $2,675 Principal Balance; Real Estate Taxes and Water and Sewer Charges Paid by her; and Interest From the Maturity of the Agreement to Date, but not to Rentals for the Premises.*

The respective positions of the Debtor and of the Defendant regarding the elements which the Defendant can properly include within her proof of claim are consistent with each other in only one notable respect: both are inconsistent not only with each other, but internally.

The Defendant has the better of the argument of what the correct balance due of the $7,000 principal obligation is or should be. It is true that the Debtor, without providing any support for same except recitations in a letter and a receipt sent to her by the Defendant, claimed to have paid $4,525.00, which would leave a balance of $2,475.00. However, the Debtor also conceded that the Defendant's recordkeeping was notoriously accurate, and the Defendant's ledger and collection of receipts support the conclusion that only $4,325.00 was paid to the Defendant by the Rowes, leaving a balance of $2,675.00. We therefore so found in Finding of Fact 3, page 715 *supra.*

The parties stipulated to the amounts of real estate taxes ($2998.63) and water and sewer bills ($528.37) paid by the Defendant over the term covered by the agreement. *See* Finding of Fact 4, page 715 *supra.* They disagree on whether the Debtor is liable to reimburse the Defendant for same as aspects of the Defendant's secured proof of claim. As the homemade agreement of June 1, 1979, is silent or at best ambiguous as to both of these elements (it references "utilities," which may or may not include water and sewer charges but almost certainly does not reference taxes), we must resort to the common law of Pennsylvania regarding the allocation of such costs when the parties have failed to reference same at all in their contract.

In deciding that installment land sale contracts could be characterized as security agreements to purchase the real estate in issue in *Fox, supra,* 83 B.R. at 297, we observed that

> courts construing Pennsylvania law have held that execution of an agreement of sale of land vests the vendee with equitable title to the realty purchased immediately upon its execution and prior to settlement, *e.g., McCannon v. Marston,* 679 F.2d 13, 15 (3d Cir.1982); *Vogel v. Northern Assurance Co.,* 219 F.2d 409, 411 (3d Cir.1955); *Allardice v. McCain,* 375 Pa. 528, 535, 101 A.2d 385, 389 (1953); *Anderson Contracting Co. v. Daugherty,* 274 Pa.Super. 13, 20–23, 417 A.2d 1227, 1230–31 (1979); and *Long John Silver's Inc. v. Fiore,* 255 Pa.Super. 183, 189–90, 386 A.2d 569, 572 (1978).

While, of these cases, only *Anderson* involved an installment land sale contract as opposed to a more conventional agreement of sale, we also referred, in that Opinion, to two bankruptcy cases in which installment land sale contracts were analyzed as if they were agreements of sale. *See In re Pribonic,* 70 B.R. 596, 602–06 (Bankr.W.D.Pa. 1987); and *In re Love,* 38 B.R. 771, 774–76 (Bankr.D.Mass.1983) (construing Pennsylvania law). *Accord, In re Mitchell,* 80 B.R. 350, 352–53 (Bankr.W.D.Pa.1987); and *In re Polay,* 66 B.R. 543, 545 (Bankr.E.D.

Pa.1986). The fact that the Debtor attempts to now avoid the imposition of charges for taxes and water and sewer charges is, we submit, totally inconsistent with her contention that she should be treated as the equitable owner of the Premises.

With a fair degree of consistency, the Pennsylvania decisions have followed the black-letter law set forth in 77 AM.JUR.2d 489 (1975), as follows:

> As between the parties to a contract for the sale of land, in the absence of a specific statute or an express or implied agreement, the party who is in possession or entitled to possession at the time when a tax accrues or becomes a lien is ordinarily bound to pay such tax where it accrues or becomes a lien after the making of the contract and before a conveyance, unless there has been a delay in making the conveyance caused by the fault of the other party.

We cannot say that there has been any delay in settlement on the part of the Defendant, who consistently urged the Rowes to go to settlement prematurely. So far as we know, the Debtor has not made a good faith offer to go to settlement since the contract matured over six years ago. The Third Circuit Court of Appeals, in *United States v. Certain Parcels of Land in Philadelphia, Pa.,* 130 F.2d 782, 785 (3d Cir. 1942), follows the black-letter rule set forth above, while noting that, as of that date, it was difficult to find a line of Pennsylvania cases so holding. Since that date, the Pennsylvania Supreme Court, citing the above Third Circuit decision, has expressed this black-letter law to indeed be the law of Pennsylvania. *In re Appeal of Board of School Directors of Owen J. Roberts School District,* 500 Pa. 465, 472–73, 457 A.2d 1264, 1267–68 (1983); and *Appeals of Baltimore & O. R.R..,* 405 Pa. 349, 354, 175 A.2d 841, 843–44 (1961). To the extent that the only case cited by the Debtor on this point, *Mint Realty Co. v. Philadelphia,* 218 Pa. 104, 111–13, 66 A. 1130, 1132–33 (1907), holds to the contrary, we believe that it has been implicitly overruled by

*Owen J. Roberts* and *Baltimore & O. R.R.*, *supra.*

■ Therefore, we conclude that it is consistent with the common law of Pennsylvania as well as our allowing the Debtor to opt for the treatment as a vendee of the Premises, to require the Debtor to accept liability for the tax payments made during her period of possession of the property as a contractual vendee of same.

We note that, in *Capodonno*, 83 B.R. at 289; and *Fox*, 83 B.R. at 304, we obligated the respective debtor-vendees in similar contracts to pay all future real estate taxes on the premises. We will require the Debtor here to do so as well. In *Fox*, moreover, we required the debtor to assume all past "real estate liens and water and sewer liens on the Premises." *Id.* Therefore, the Defendant is entitled to include reimbursement for the $2,998.63 which the parties agree that she has expended towards real estate taxes on the Premises in her proof of claim.

The issue of the Debtor's liability for past water and sewer charges is even more easily resolved. In *Byrne v. Kanig*, 231 Pa.Super. 531, 534–37, 332 A.2d 472, 473–75 (1974), the court concluded that a lien to construct a sanitary sewer fell upon the vendee under an installment land sale contract, even though the contract included a provision which obligated the vendor to convey title free and clear of encumbrances. Requiring the vendee to absorb this lien in the face of inclusion of the provision requiring the conveyance free and clear sparked a dissent. 231 Pa.Super. at 537–39, 332 A.2d at 475–76. However, the seven Superior Court judges hearing this case were unanimous in concluding that the equitable ownership interest of a vendee in an installment land sale contract which was silent on the subject rendered the vendee liable for payment of a municipal sewer lien.

■ The other authority cited by the Defendant on the issue of the Debtor's accountability for payments for water and sewer liens, *Sladkin v. Greene*, 359 Pa. 528, 59 A.2d 105 (1948), is even more convincing. There, although the lawsuit involved a complaint seeking specific performance of an agreement of sale against the vendors, the issue of liability for water and sewer rents arose in the context of measurement of part of the relief granted to the vendees, *i.e.*, imputed rent from the vendors when they improperly remained in possession of the premises. The lower court had refused to give the vendors credit for water and sewer bills which they paid during this imputed tenancy. The Supreme Court held as follows on this point, 359 Pa. at 532, 59 A.2d at 107:

> Defendants argue in their paper book that on the basis of the landlord-tenant relationship established by the court, they should be reimbursed by plaintiffs for payment of water rentals form June 1, 1946, to the time of actual conveyance. This argument cannot be sustained since a tenant is responsible for any water rentals incurred by reason of his occupancy of the premises.

Thus, even if the Rowes were viewed as mere tenants of the Premises, they would have been liable for the payment of water and sewer rentals consumed by them during their possession of the Premises. The liability of even tenants to pay for water consumed on the premises, in the absence of an agreement to the contrary, is, again, supported by black-letter law. 49 AM. JUR.2d 230 (1970); and Annot., *Implied Covenant or Obligation of Lessor to Furnish Water or Water Supply for Business Needs of the Lessee*, 65 A.L.R.2d 1313, 1315 (1959). If tenants would be liable for water and sewer charges, then vendees surely are liable for same.

Also consistent with the conclusion that the Debtor is liable for the water and sewer charges paid by the Defendant, are, again, our directives in *Fox*, 83 B.R. at 304; and *Capodanno*, 83 B.R. at 289, that the respective debtor-vendees in the installment land sale contracts in issue in those cases must pay such charges, and the Rowes' own course of conduct in paying such bills since 1982. Consequently, we conclude that the Defendant is entitled to add reimbursement for the agreed amount

of water and sewer bills paid by her, *i.e.,* $528.37, to her proof of claim.

Where we believe that the Defendant lapses into inconsistency comparable to that of the Debtor in denying liability for taxes and water and sewer rents despite holding herself out as the equitable owner of the Premises, is in making a claim for the alleged fair market rent of the Premises from May, 1984, to date in the amount of $250 per month. If the Debtor is indeed conceived as the equitable owner of the Premises, which is a necessary element of the conclusion that she is liable for taxes and water and sewer charges, and interest on the balance due on that obligation, which we address at pages 727–28 *infra,* then she cannot also be conceived as a tenant liable for rent at the same time.

The Defendant posits two theories supporting inclusion of the rent charge in her proof of claim. One presupposes that the contract has been terminated and the Debtor's status has become that of a trespasser or a tenant at sufferance. This theory is quashed by our conclusion that no termination of the Debtor's rights as a vendee has occurred. *See* pages 718–22 *supra.*

The alternative theory is that rentals can be imputed as an element of damages for the Debtor's breach, recoverable under 68 P.S. § 905(e) of the ILCL. Interestingly, that statutory provision enumerates several potential elements of damage recoverable by a vendor—loss of the benefit of the installment land sale contract bargain, installment payments due prior to surrender of the Premises, and the cost of repairs made necessary by the vendee's acts or those of third-parties prior to redelivery of possession by the vendor—and expressly excludes recovery of the entire unpaid purchase price. The measure of damages set forth in § 905(e) for the vendee's holding over when payments are not made as are due under the agreement appears to us to be inconsistent with the measure of such damages at the rental value of the Premises. This suggests that the damages for holding over, after the agreement has run its course, should not be measured by the rental value of the Premises.

■ By analogy, we do not conceive the remedy of an unpaid mortgagee of a premises to be recovery of the premises' rental value from the delinquent mortgagor. Rather, we believe that the remedy is repayment of costs for which the mortgagor is liable, plus interest on the unpaid balance. As we are allowing the Debtor to conceptualize the parties' relationship as a security agreement, like the mortgagor-mortgagee relationship, we hold that any claim of the Defendant against the Debtor for rents is misplaced.

As we indicated in the last paragraph and as we indicated in *Klein, supra,* 106 B.R. at 402 & n. 7, *see* page 724 *supra,* we consider the appropriate remedy for the Debtor's delinquency in payments past the maturity date of the agreement to be payment of interest to the Defendant.

The Debtor, to the extent that she opposes any imposition of interest upon her, seems to argue that, since the agreement did not require payment of interest during the term of its duration, any imposition of interest even at this juncture is improper. It is true that, in *Capodonno,* 94 B.R. at 63 n. 1, we did not require the debtors to pay interest to defer the payments under their Chapter 13 plan towards their obligation to the vendors under an installment land sale contract pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) because the contract failed to include a provision that interest must be paid on the principal balance. *See In re Mitchell,* 77 B.R. 524, 529 (Bankr.E. D.Pa.1987) (deferral interest need be paid only at the lower of the contact and the market rate). However, as abysmal as the payment record of the *Capodonno* debtors had been, the installment land sale contract had not, as the instant contract, reached maturity prior to the debtors' bankruptcy filing. It was only the balance due on the vendors' pre-petition and post-petition principal indebtedness that was paid off under the *Capodanno* plan. 94 B.R. at 64, 83 B.R. at 286.

■ Here, however, the Debtor's obligation to pay off the $7,000 sale balance

matured over six years ago. Despite the Defendant's statements that the maturity date was May, 1984, we take judicial notice of the fact that, had the Rowes made payments of $125 monthly consistently from June 1, 1979, and thereafter, the $7,000 obligation would have been liquidated in 56 installments. The last payment would have therefore been due on January 1, 1984. That is therefore the date that the obligation matured, and hence became liquidated and certain.

The Defendant argues, we believe correctly, that pre-judgment interest at the statutory rate of six (6%) percent, 41 P.S. § 202, runs, as a matter of law, through the date that the liquidated and certain balance due of $2,675 is paid. *See, e.g., Black Gold Coal Corp. v. Shawville Coal Co.,* 730 F.2d 941, 943 (3d Cir.1984); *In re Rorie,* 98 B.R. 215, 219 (Bankr.E.D.Pa. 1989); *In re University Medical Center,* 93 B.R. 412, 417 (Bankr.E.D.Pa.1988); *Verner v. Shaffer,* 347 Pa.Super. 206, 211, 500 A.2d 479, 482 (1985); and *Canuso v. City of Philadelphia,* 326 Pa. 302, 309–10, 192 A. 133, 136–37 (1937).

The Defendant suggests that pre-judgment interest should be measured over the period from July 4, 1983, when the contract was allegedly terminated, until November 9, 1988, the date when the Debtor's bankruptcy petition was filed. We disagree with both the ending and starting dates proposed. First, since we have concluded that the parties' agreement was never validly terminated, *see* pages 718–22 *supra,* we cannot agree that pre-judgment interest began to accrue on any date that such a termination allegedly occurred. Rather, it began to accrue as of the date that the contract matured and the Debtor's liability for the principal became fixed, *i.e.,* when the Debtor failed to make the final payment due under the terms of the agreement on January 1, 1984. Furthermore, since the Defendant is oversecured, a conclusion which the Defendant's position that her claim exceeded $22,000 prevented her from reaching, she is entitled to post-petition interest. *See* 11 U.S.C. § 506(b). As we indicated in *Klein, supra,* 106 B.R. at 402 & n. 7, interest should continue to accrue up until the date of confirmation, when 11 U.S.C. § 1325(a)(5)(B)(ii) kicks in. We should observe, moreover, that, in all probability, interest will continue at the statutory rate after confirmation. Since the loan matured long before the bankruptcy filing, we believe that, as a matter of law, deferral interest may be demanded by the Defendant and, if demanded, must be paid under the terms of the Debtor's plan in order for it to be confirmed.

For purposes of measurement of the Defendant's claim, we have decided to allow a claim for interest through January 1, 1990, with the assumption that deferral interest will accrue thereafter. Further, we will schedule a final Confirmation hearing on March 6, 1990. Interest for six years at six (6%) percent per annum on a principal balance of $2,675 amounts to interest of $963.00. We will allow interest in this amount to be added to the Defendant's proof of claim.

We therefore measure the Defendant's secured proof of claim as follows:

| | |
|---|---|
| Principal balance | $2,675.00 |
| Interest | 963.00 |
| Real estate taxes | 2,998.63 |
| Water and sewer charges | 528.37 |
| TOTAL | $7,165.00 |

6. *The Debtor is Not Entitled to Prevail on her Counterclaim Seeking Damages for the Defendant's Alleged Malicious Prosecution of the 1985 Landlord–Tenant Eviction Action Against the Debtor.*

 The Debtor has alleged a claim for damages of $400 against the Defendant, arising from a legal fee incurred by her to defend against the Defendant's alleged malicious prosecution of the March, 1985, PMC landlord-tenant eviction proceeding against the Debtor. *See* Findings of Fact 10–11, page 716 *supra.* The crux of this claim of the Debtor is that the Defendant knew or should have known, as the result of her first unsuccessful encounter with an attempt to evict the Rowes pursuant to a similar proceeding in the PMC in 1981, *see* Finding of Fact 6, page 715 *supra,* that the PMC lacked jurisdiction to sustain such

a claim and that, therefore, filing such an action was without any purpose except to attempt to misuse the court system and harass the Debtor.

We note that the tort of malicious prosecution has been codified in Pennsylvania. The elements of such a claim are thusly set forth in 42 Pa.C.S. § 8351:

> (a) Elements of action.—A person who takes part in procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings [sic]:
>
> > (1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
> >
> > (2) The proceedings have terminated in favor of the person against whom they are brought.

Also, the burden of proving all elements of the cause of action, in the conjunctive, is thusly squarely placed upon the claimant in 42 Pa.C.S. § 8354:

> § 8354. Burden of proof
>
> In an action brought pursuant to this subchapter the plaintiff has the burden of proving, when the issue is properly raised, that:
>
> > (1) The defendant has procured, initiated or continued the civil proceedings against him.
> >
> > (2) The proceedings were terminated in his favor.
> >
> > (3) The defendant did not have probable cause for his action.
> >
> > (4) The primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.
> >
> > (5) The plaintiff has suffered damages as set forth in section 8353 (relating to damages).

The Debtor did ultimately prevail in the 1985 PMC action on appeal, although we note that the defendant won her case in the PMC. The proceeding appears to have lacked jurisdictional probable cause, if not equitable cause. Perhaps the criteria of lack of probable cause and a termination of the proceedings in favor of the Defendant were satisfied. We would note, however, that the issue of probable cause was apparently not obvious to the PMC. If the parties' installment land sale contract had in fact been validly terminated in 1983, and it was not totally clear that the contract had not been validly terminated even as of 1990, it is not totally clear that the parties' relationship would not have reverted to that of landlord and tenant. Witness the claim which the Defendant makes here for rental payments which, while we reject it, is not frivolous. It cannot be forgotten that the period of time over which the Debtor has retained the Premises while making one payment since April, 1981, almost *nine years*, is very substantial. It might be logical for a layman, proceeding pro se in the PMC, to assume that, after such a period, the agreement had died of old age and neglect.

In any event, the Debtor has failed to establish that the primary purpose of the PMC proceeding was other than obtaining possession of the Premises to which the Defendant reasonably considered herself to be entitled. No other purpose has been suggested. We therefore conclude that the Debtor has not proven the element set forth in 42 Pa.C.S. § 8354(4), *i.e.*, the proceedings were initiated for an improper purpose, and that the Debtor's counterclaim to the Defendant's proof of claim must be dismissed.

## E. CONCLUSION

We therefore conclude that the Debtor is entitled to maintain this Chapter 13 case and that she is entitled to a reduction of the Defendant's secured claim to $7,165.00. We have decided most of the many issues presented by the parties, although final disposition of a few must be deferred until confirmation. We have tried to guide the parties as to our impressions on the undecided issues to avoid disposition of another

lengthy series of disputes at the confirmation stage of this case.

The most serious question faced by the Debtor at this point, as we view it, is one of plan feasibility. See 11 U.S.C. § 1325(a)(6). The Debtor has, perhaps unwisely, presumably paid no more than $47 monthly to the Trustee over the first 14 months of her 60–month plan period. Therefore, the sum to be deferred at the time of confirmation will approach $7,165 less payments of about $650, or approximately $6,500. Since we believe that deferral interest at the statutory rate may have to be continued to be paid under the Debtor's proposed Plan, interest of about $800 may have to be paid. Also payable will be a Trustee's commission of about $750 on the balance. Hence, about $8,000 in payments will be necessary to fund the Plan. As only 46 plan-months remain in which to pay this entire sum, payments of close to $180 monthly will be necessary. We will order that this amount be paid to the Trustee monthly, beginning in February, 1990, pending confirmation. We also note that taxes, water and sewer, and insurance charges must be paid by the Debtor as well, and we will so order. We cannot help but observe that the monthly remittances required for these payments will alone exceed the $200 monthly contributions from the Debtor's son which are her sole source of income.

Unfortunately, because of the delays in presenting the somewhat complex matters presented in the instant motion and proceeding to this court, much time has been expended. We must insist that the Debtor attempt to prepare a feasible amended plan on or before February 22, 1990, as a precursor to the scheduling of what we believe will be a final confirmation hearing on March 6, 1990. We will carry along the Defendant's § 362(d) motion until that date. The Debtor has been the beneficiary of delays in the past. However, we cannot and will not allow them to continue.

An Order consistent with the conclusions expressed in this Opinion will be entered.

### ORDER

AND NOW, this 8th day of February, 1990, after a consolidated trial of the above-entitled proceeding and the Motion for relief from the Stay and Objection to the Debtor's exemption filed by ANNA CONNERS (hereinafter "the Defendant") on October 24, 1989, and upon consideration of the parties' post-trial submissions and Reply Briefs, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtor, MIRIAM ROWE, and against the Defendant, ANNA CONNERS, on the claim set forth in the above adversary Complaint in part, with the exception of the Debtor's counterclaim against the Defendant's proofs of claim, in which judgment is entered in favor of the Defendant and the said claim is DISMISSED.

2. The Defendant is determined to have a valid secured claim of $7,165.00.

3. The Defendant's Objections to the Debtor's claim of exemptions are DISMISSED.

4. The Defendant's Motion for Relief from the Automatic Stay is provisionally DENIED on the condition that the Debtor does the following:

   a. Remits payments of at least $180 monthly to the Trustee on or before February 20, 1990, and the 20th day of each succeeding month, pending confirmation of a Plan of Reorganization.

   b. Assumes and pays for all future and presently-due real estate taxes and water and sewer charges relating to the premises at 222 East Allegheny Avenue, Philadelphia, Pennsylvania 19134 (hereinafter "the Premises").

   c. Retains and pays for fire insurance on the Premises at present and in the future.

   d. Files an Amended Plan of Reorganization not inconsistent with this Order and the accompanying Opinion, and serves same upon the Defendant's counsel, the Trustee, and the court in chambers, on or before February 22, 1990; and obtains confirmation of a Plan of Reorganization

on March 6, 1990, or any further date established on that date.

e. If the Debtor fails to comply with any of the terms of paragraphs 4(a), (b), (c), or (d) herein, the Defendant shall provide notice of same to Debtor and her counsel. If the default is not cured within twenty (20) days and no order granting any dispensation on motion for good cause shown is granted, the Defendant may certify same to the court and obtain relief from the stay.

5. The hearing on Confirmation of the Debtor's Plan presently scheduled on February 14, 1990, is CANCELLED.

6. A hearing to consider Confirmation of any Amended Plan filed and to further consider whether relief from the automatic stay should be granted to the Defendant is scheduled on

TUESDAY, MARCH 6, 1990, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

7. No continuance of the hearing date set forth in paragraph six will be allowed.

8. This Order shall be filed and docketed in both the above-captioned main case and Adversary Proceeding.