**In re Natalino and Ruth CAPODANNO, Debtors.**

**Bankruptcy No. 87–05961S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 12, 1988.

Eric L. Frank, Community Legal Services, Inc., Philadelphia, Pa., for debtors.

Richard D. Gorelick, Philadelphia, Pa., for Garzarellis.

Warren T. Pratt, Philadelphia, Pa., for Meritor Sav. Bank.

Edward Sparkman, Philadelphia, Pa. trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

Louis and Barbara Garzarelli (hereinafter referred to as "the Creditors") continue to vigorously oppose the Debtors at every turn, as they did in seeking relief from the automatic stay in a motion filed shortly after the bankruptcy filing which we denied on March 3, 1988, in an Opinion reported at 83 B.R. 285. We believe that this opposition is partially motivated by their disdain in seeing the Debtors not only purchase their house from the Creditors at a bargain price under a Real Estate Installment Sale Contract of June 11, 1985 (hereinafter "the Contract"), but also retain a boat, a luxury which the Creditors themselves do not possess. We believe that the Creditors' Objections to confirmation, arising from the Debtors' alleged failure to meet the criteria to allow a five-year Plan pursuant to 11 U.S.C. § 1322(c) and the Debtors' alleged failure to satisfy the feasibility requirement of 11 U.S.C. § 1325(a)(6), can both be satisfied by the medium of requiring the Debtors to market the boat, their retention of which seems to stick so hard in the Creditors' craw. We shall therefore indicate our intention to confirm the Debtors' Plan only on the condition that the boat be marketed, and that the Debtor-husband agree to a wage attachment to fund the Plan.

The Debtors filed this Chapter 13 bankruptcy case on December 1, 1987. In our prior decision of March 3, 1988, we denied the Creditors' motion for relief from the automatic stay filed on January 14, 1988, holding, in addition, that the Debtors could opt to treat the Contract like a sale of the home subject to a purchase-money mortgage rather than as an executory contract, consistent with our conclusions in *In re Fox*, 83 B.R. 290, 294–302 (Bankr.E.D.Pa. 1988). Although their payment record was poor, this analysis permitted us to conclude that the Debtors had a significant equity cushion in their home. *Id.* at 286, 288. However, we attached numerous conditions, notably requiring the Debtors to remain current on payments of $400.00 monthly thereafter and scheduling a Confirmation Hearing, without allowing for any continuances, on July 26, 1988. *Id.* at 289.

On July 1, 1988, the Debtors' counsel filed an Amended Plan containing several novel elements, including making payments directly to the creditors' own mortgagee, Meritor Savings Bank (hereinafter "Meritor"); rendering Meritor subject to the stay and acceptance of a deferred interest rate of nine (9%) percent on its loan; and paying off Meritor and the balance owed to the Creditors[1] in full over 60 months. Unfortunately, the Debtors failed to make all of their payments as required in the Order of

---

**1.** The facility of the Debtors to pay off their obligation to the Creditors arose from the fact that the Contract, almost incredibly, failed to provide that the Debtors were obliged to pay interest on the principal balance due under the Contract. *See* 83 B.R. at 286 & n. 2. Under our holding in *In re Mitchell,* 77 B.R. 524, 529

(Bankr.E.D.Pa.1987), that a debtor need only pay the lesser of the market rate *or* the contract rate to fulfill the prerequisite of 11 U.S.C. § 1325(a)(5)(ii), the Debtors were therefore not obliged to pay any interest for deferral of this obligation.

March 3, 1988. This prompted the Creditors to file a new motion for relief from the stay, a motion to dismiss the case, and Objections attacking the feasibility of a Plan which relied upon binding Meritor to the terms of the Debtors' Plan and the Debtors' payment performance. All of these matters, plus the Debtors' Objection to the Creditors' Proof of Claim, were scheduled with the Confirmation Hearing on July 26, 1988.

At that hearing, the Debtors produced sufficient funds to catch up on their postpetition payment delinquency. On August 1, 1988, we issued an Order again requiring the Debtors to make payments, with only a five-day as opposed to the 20–day grace period included in our Order of March 3, 1988, 83 B.R. at 289; requiring them to file a declaratory adversary proceeding against Meritor to determine whether Meritor would or could be bound by the Debtors' Amended Plan; and rescheduling the hearing on Confirmation and the Creditors' various motions on September 22, 1988. The hearing was continued by agreement to October 6, 1988.

In the meantime, the Debtors filed a Second Amended Plan on September 22, 1988, which remains before us for consideration. A hearing on all the outstanding matters was conducted on October 6, 1988. At its close, we urged the parties to consummate a reported settlement with Meritor and to resolve the amount of the Creditors' claim. We allowed the Creditors until November 7, 1988, to brief any remaining issues, and the Debtors until November 21, 1988, to respond.

Meritor ultimately agreed to be bound by the terms of the automatic stay and the Second Amended Plan. We shall execute an Order approving this agreement at this time. The parties also agreed to the amount of the Creditors' claim, *i.e.,* $1,544.00. However, they apparently could not agree on further Plan amendments which would eliminate the Creditors' Objections. We shall help them to do so.

■ The creditors' first Objection is based upon 11 U.S.C. § 1325(a)(6), which reads as follows:

§ 1325. Confirmation of Plan

(a) Except as provided in subsection (b), the court shall confirm a plan if—

.    .    .    .    .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

The Creditors contend that the erratic income of the Husband–Debtor, combined with the considerable financial needs of the Debtors' family, which includes seven children, renders the Debtors incapable of paying the $435.00 monthly payment to the Trustee called for over the last 50 months of the Plan.

We agree with the Creditors' contention that feasibility of a Plan is an absolute prerequisite to confirmation. As Collier states, it is "[b]y far the most important criterion for the confirmation of a chapter 13 plan." 5 COLLIER ON BANKRUPTCY, ¶ 1325.07, at 1325–43 (15th ed. 1988). Feasibility is properly always a major concern of our Standing Chapter 13 Trustee, who will not recommend confirmation of a Plan in which the debtor does not contemplate payment of at least all secured and priority claims filed.

However, here, there is apparently no question that the Plan is potentially feasible in the sense that all such claims will be paid. Rather, the Creditors' concern is that the Debtors' income is insufficient to allow them to make the payments, despite their protestations to the contrary.

Cited by the Creditors in support of their position are the following relatively dated cases, in which courts found, essentially, that debtors with large families and/or reduced incomes were not reasonably able to pay the amounts called for in their respective Plans: *In re Belka,* 13 B.R. 607, 610 (Bankr.W.D.Mich.1981) (family of ten had only $9.00 monthly "cushion"); *In re Guerrieri,* 10 B.R. 464, 465 (Bankr.D.R.I.1982) (unemployed debtors with four children had no "cushion"); and *In re Hockaday,* 3 B.R. 254, 255–56 (Bankr.S.D.Cal.1980) (single parent with child had only $10.00 "cush-

ion").[2]

We have located no recent cases which take such a pessimistic view of debtors' economic prospects. These cases may have been fostered in part by the rising interest rates and unemployment of the early 1980's which the courts felt dampened the respective debtors' prospects. However, more recent cases recognize that § 1325(a)(6) only requires that the Debtors' budget appears realistic and that the "expectations of income are sufficiently realistic that they should be given an opportunity to carry out the plan they propose." *In re Compton*, 88 B.R. 166, 167 (Bankr.S.D.Ohio 1988). *See also In re Frey*, 34 B.R. 607, 608–09 (Bankr.M.D.Pa.1983); *In re Anderson*, 18 B.R. 763, 765 (Bankr.S.D. Ohio 1982); and *In re Perskin*, 9 B.R. 626, 632–33 (Bankr.N.D.Tex.1981).

Our own decisions have acknowledged the economic resiliency of low-income persons, who are often accustomed, by necessity, to get by on financial arrangements which persons blessed with higher incomes find inconceivable. *See In re Crompton*, 73 B.R. 800, 809 (Bankr.E.D.Pa.1987) (in considering financial prospects of unmarried female debtor with two young children, this court refuses to set down a rule that "cushion" is always a prerequisite). We fail to see where we are doing any favors to persons in dire financial straits by declining to give them a chance to preserve their homes, thereby pushing them closer to or into the growing ranks of the homeless. Therefore, we are inclined to give debtors a chance, even when their post-payment performances have been "abysmal" as long as their plan "does not seem to us to be out of reach." *In re Mitchell*, 75 B.R. 593, 599, 600 (Bankr.E.D. Pa.1987). If they fail to maintain their payments under the Plan, the Standing Chapter 13 Trustee, as well as any interested party, may move for dismissal or conversion of the case to Chapter 7. 11 U.S.C. § 1307(c)(6).

We do recognize that certain, hopeless or visionary plans must be rejected from the outset as infeasible. *Cf. In re Gulph Woods Corp.*, 84 B.R. 961, 973–75 (Bankr. E.D.Pa.1988) (Chapter 11 case) (Debtor whose principal was proven to be incompetent and a bankruptcy recidivist held to be incapable of feasibly performing pursuant to a proposed plan); and *In re Evans*, 66 B.R. 506, 508 (Bankr.E.D.Pa.1986), *aff'd.* 77 B.R. 457 (E.D.Pa.1987) (Plan of debtor whose net annual income was $7,384.00 who agreed to pay the totally unrealistic figure of $2,600.00 monthly was held to have proposed an infeasible Plan).

Collier, though emphasizing the importance of the feasibility requirement, agrees with our approach. That text counsels that "[e]ven when the court has serious doubts about feasibility, the debtor should usually be given a chance to attempt their proposed plan [and] ... the court should be reluctant to impose its idea of what sacrifices the debtor is able to make." 5 COLLIER, *supra*, ¶ 1325.07, at 1325–45. We therefore approach the Creditors' analysis of the Debtors' economic status, in reference to § 1325(a)(6), with the spirit of giving the Debtors the benefit of any doubt.

The factual analysis of the Creditors assumes the accuracy of the monthly budget of $1,860.00 recited by the Wife-debtor at the July 26, 1988, hearing. They then transpose the weekly workmen's compensation of $144.00 which the Wife-debtor testified she received at the July 26, 1988, hearing, and the past four weeks' net salary of $1,610.51 revealed by the pay stubs of the Husband-debtor produced at the October 6, 1988, hearing into a monthly income of $2,186.51, by multiplying the $144.00 sum by four and adding it to $1,610.51. They then deduct the expenses of $1,860.00. The resulting figure is $326.51, which indicates a short-fall of over $100.00 when the Plan payments rise to $435.00 monthly, let alone any "cushion."

---

**2.** The Creditors also cite *In re Roe*, 14 B.R. 649, 655–56 (Bankr.D.Kan.1981), although the principal feasibility problem there was the Plan's providing that six creditors would be paid outside the Plan, which the court stated violated the "spirit" of the Bankruptcy Code. No similar problem exists here.

However, the Creditors' calculations suffer from a mathematical flaw. To convert weekly income to monthly income, it must be considered that there is an average of 4.3 weeks in a month. When the Husband-debtor's average weekly net salary of $402.63 is added to the $144.00 weekly workmen's compensation received by the Wife-debtor, the family's weekly income figure is $546.63 which, factored by the proper multiplier of 4.3, yields a monthly income figure of $2,350.51. This leaves a "cushion" of over $55.00 monthly after the $1,860.00 monthly expenses and $435.00 monthly Plan payments are deducted. Therefore, we do not agree with the Creditors' contention that simple mathematics disproves the feasibility of the Debtors' Second Amended Plan.

■ The Creditors also point to the overly-optimistic projections of the Husband-debtor concerning his work-hours in the past and the potential vicissitudes of the construction industry in which he is employed as a basis for doubting that even the present income flow of the Debtors will continue. The Husband-debtor testified that his employer had inside work for him which would keep him employed throughout the winter. However, we remember all too well the Debtors' delinquencies which were belatedly cured at the July 26, 1988, hearing. We believe that the Debtors will have to deal with countless contingencies, given their large family. Confirmation of the Plan will eliminate the no more than five-day grace period leash imposed upon the Debtors by our Order of August 1, 1988. We therefore will not confirm their Plan unless it is amended to provide (1) for a wage attachment, thereby effectively preventing the Debtors from utilizing funds necessary for funding their Plan for any other purposes; and (2) for marketing of the boat, the sale of which will generate a cushion. However, with those assurances

of payment added to the Plan, we are confident that it is reasonably feasible.

The Creditors' second Objection is based upon 11 U.S.C. § 1322(c), which provides as follows:

(c) The plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years.

The Creditors argue that the Debtors have not met their burden of showing sufficient cause to extend their Plan from three years to five years, citing *In re Fries*, 68 B.R. 676, 679–81 (Bankr.E.D.Pa.1986) (per FOX, J.); *In re Festa*, 65 B.R. 85 (Bankr.S.D. Ohio 1986); and *In re Minor*, 16 B.R. 147 (Bankr.S.D.Ohio 1981).

The foregoing cases do establish that a debtor does have a burden to meet before a bankruptcy court will permit the debtor to extend payments from the normal three-year period to a five-year period. We agree with the Creditors' implicit contention that the Debtors have been too casual about their procedural and substantive burdens under § 1322(c) in merely proposing a five-year plan and inserting a paragraph in the Plan (¶ 9) that the court, in confirming the Plan, necessarily finds that the requisite cause for an extension exists without the filing of a separate application. *See In re Gurst*, 76 B.R. 985, 989 (Bankr.E.D.Pa. 1987).[3]

However, turning to the substance of the Creditors' Objections, we find very little merit in it. In *Minor*, the court merely states that the burden is upon the debtor, and denies confirmation only on the procedural ground that the burden has not yet been met. In *Festa*, the court, in a spirit of smothering maternalism, holds that a debtor's desire to pay more to unsecured credi-

---

**3.** We also acknowledge that we have been too casual in the past in allowing such Applications *ex parte*, or with the joinder of only the Standing Chapter 13 Trustee. Since such matters are properly not among the listed matters which we intend to grant *ex parte, see* Local Bankruptcy Rule (hereinafter "L.B. Rule") 9013.3(b), we should require notice to all parties in interest

including the United States Trustee, pursuant to L.B. Rule 9013.3(d) before we approve same. We shall adhere to this procedure in the future. We reiterate our disapproval of "loading up" the Plan itself with matters, such as an extension of the Plan-period, which should be dealt with separately elsewhere. *See Gurst, supra,* 76 B.R. at 989–91.

tors was not sufficient cause to extend the plan term. In *Fries,* Judge Fox questions the result of cases such as *Festa,* 68 B.R. at 680, and holds that a debtor's reasonably perceived inability to pay secured and priority claims in a shorter period justifies an extension of the plan beyond three years. He agrees with the assessment of Collier that such extensions "should be allowed without difficulty in such circumstances, since without them the debtor may be unable to obtain effective relief under Chapter 13." 5 COLLIER, *supra,* ¶ 1322.15, at 1322–34. *See also In re Harmon,* 72 B.R. 458, 462 (Bankr.E.D.Pa.1987) (per TWARDOWSKI, CH. J.); and Comment, *Chapter 13: "Cause" for Extension Under Section 1322(c),* 5 BANKR.DEV.J. 249, 266 (1987) ("The courts' pro-debtor interpretation of Section 1322(c) reflects the policy consideration that the trustee or unsecured claimant should not be permitted to use strong arm tactics to coerce the debtor into paying more than what is required at bankruptcy; …").

■ We addressed the § 1322(c) requirement in *In re Gathright,* 67 B.R. 384, 391 (Bankr.E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987), and concluded, consistently with Collier, *Fries,* and the above-referenced Comment, that extension of a plan beyond three years should be strictly the debtor's option. Moreover, given that the historic reason for any limitation on length of Chapter 13 Plans is to prevent involuntary servitude, 5 COLLIER, *supra,* ¶ 1322.15, at 1322–33; and Comment, *supra,* 5 BANKR.DEV.J. at 251–52, it would be ironic to limit the debtor from a free use of a five-year plan where he deemed it in his best interest to do so. Allowing a debtor less breathing room in a plan may be shackling him or her to something more devastating than the measure of economic "involuntary servitude" effected by a Chapter 13 Plan for an extended plan-period of two years. Therefore, we conclude that permission to extend plan-periods beyond three years should be freely given whenever any reasonable justification for same is articulated by the debtor.[4]

■ The main reason that we find little substantive merit in the Creditors' position here is that their hypothesis that the Debtors could and should pay off their creditors more quickly is at war with their other objection, *i.e.,* that the Debtors lack sufficient income to render their Plan feasible, even if payments are spread out over five years. Decreasing the length of the Plan would only increase the monthly payments and heighten the feasibility deficiencies perceived by the Creditors. We therefore can easily conclude, on the facts here, that the Debtors should not only be permitted, but are well-advised, to extend their Plan to 60 months under § 1322(c).

We do, however, acknowledge the burdens which extension of the Plan works upon the Creditors who, unlike Meritor, will receive no interest to assuage their delay in waiting for their money and, unlike Meritor, are themselves persons of limited financial means. However, we believe that the ends of the Creditors on this score will be met by our requiring the Debtors to market their boat. If they do sell it, they will have the funds available to liquidate their Plan more quickly.

As we have indicated throughout this Opinion, we are prepared to overrule the Creditors' Objections only if the Debtors' Second Amended Plan is amended again to provide that the Debtors market their boat and that the Husband-debtor agrees to a wage attachment to fund the Plan. We emphasize that we are inclined to impose these conditions only because of the coalescence of several factors here. First, the Husband-debtor, at the October 6, 1988, hearing, affirmatively expressed his agreement with these conditions. Secondly, confirmation will eliminate the five-day grace-period which we considered necessary in light of the Debtors' violations of the terms of our Order of March 3, 1988. We also perceive other equities here in favor of the Creditors. We would certainly not consid-

---

**4.** However, as we indicated at page 66 n. 3, *supra,* we do plan to add the procedural requirement of notice to interested parties before the requests of debtors for this mild dispensation will be allowed in the future.

er it normal to pend confirmation on conditions imposed by the court. Sale of assets and even wage attachments can generally occur in Chapter 13 cases only if the debtors so choose. It is only in the unusual setting of this most persistent controversy that we indicate that such provisions will be a condition to confirmation of the Plan of the Debtors here. We also recognize that only the debtor, and not the Trustee, a creditor, or even this court, can file a Chapter 13 plan. *See* 11 U.S.C. § 1321; and 5 COLLIER, *supra*, ¶ 1321.01, at 1321–1 to 1321–2. We therefore shall frame our Order by stating that, *if* the Debtors effect the changes recited herein in a Third Amended Plan, and the Standing Chapter 13 Trustee otherwise approves it, we will confirm it.

Our Order therefore provides that, upon receipt of a Report from the Chapter 13 Trustee recommending same, we will enter an Order approving the Report and confirming a Plan incorporating the changes to the Debtors' Second Amended Plan described in paragraph two of that Order.