**In re Robert P. FRICKER and Dolores A. Fricker, Debtors.**

**Bankruptcy No. 89–11904S.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 26, 1990.

Mark Kravitz (prior atty.), David M. Still, Norristown, Pa., for debtors.

Stephen Raslavich, Philadelphia, Pa., for Acceptance Associates of America, Inc. and "line banks".

Ross Weiss, Elkins Park, Pa., for Frank P. Lalley in his capacity as Sheriff of Montgomery County.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Joel Friedman, Media, Pa., for Herman Neumann.

Ellen McDowell, Philadelphia, Pa., for Meritor Sav. Bank.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The present posture of this case causes us to consider two general issues: (1) Whether the only Chapter 13 Plan of Reorganization which the Debtors have filed in this case can be confirmed; and (2) If not, whether we should dismiss the case *sua sponte*, as we indicated, in a prior order, we would do if the plan could not be confirmed at this time.

The first issue causes us to analyze the relative burdens of proof of Chapter 13 debtors and objectors to their Chapter 13 plan when objections to the confirmation of the plan are raised under 11 U.S.C. §§ 1325(a)(3), (a)(5), and (a)(6). We hold that, while the objector bears the burden of clearly articulating the nature of any objection on these grounds, the ultimate burden of proof is upon debtors to establish an entitlement to confirmation, rather than upon objectors to establish the validity of their objections. In the instant case, we conclude that the Debtors have failed to establish their entitlement to confirmation under §§ 1326(a)(3), (a)(5), *and* (a)(6). Therefore, confirmation must be denied. We also find that we have the power to dismiss this case and that it is appropriate to exercise that power in the context of the instant factual situation. We will, however, keep the case open to, *inter alia,* allow the trustee to pursue recovery of compensation improperly paid to the Debtors' counsel.

### B. PROCEDURAL AND FACTUAL BACKGROUND

On April 6, 1990, we filed an Opinion in an adversary proceeding arising in this Chapter 13 bankruptcy case, Adv. No. 89–0704S, reported as *In re Fricker,* 113 B.R. 856 (Bankr.E.D.Pa.1990) (*"Fricker I"*), in which we set aside a pre-petition sheriff's sale of the home of ROBERT P. FRICKER and DOLORES A. FRICKER, the Debtors ("the Debtors"), conducted in execution of a confessed judgment obtained against them by a secured creditor, Acceptance Associates of America, Inc. ("AAA"). *Id.* at 864–66. In that Opinion, we also considered at length the attacks by the Debtors, in that proceeding, against AAA's right to make any claim against them. *Id.* at 866–73. Ultimately, we determined that, in light of our reordering of the parties' positions by the invalidation of the sale, we should give AAA and the purchaser at the sale, Herman Neumann ("Neumann"), an opportunity to file proofs of claim which would result in our fixing the amounts of their claims, in order that the Debtors could have a firm basis on which to present a Plan of Reorganization for confirmation. *Id.* at 873. *Accord, e.g., In re Orsa Associ-*

*ates,* 99 B.R. 609, 618, 624 (Bankr.E.D.Pa. 1989); and *In re Corbett,* 80 B.R. 32, 38 (Bankr.E.D.Pa.1987).

In a second, presently unreported Opinion of June 11, 1990 (*"Fricker II"*), having previously established that Neumann had no valid claim, slip op. at 3–5, we held that AAA's secured claim should be fixed at $40,000. *Id.* at 20–42. Then, having expressed concern that the Debtors and their counsel were utilizing this bankruptcy case "as a vehicle for delay, with no real agenda for or prospect for a successful reorganization," *id.* at 44, we ordered that the Debtors must file any necessary Amended Plan by July 6, 1990; that any interested parties were obliged to file any Objections thereto by July 17, 1990; and that a *final* hearing to consider confirmation and whether this case should be dismissed be scheduled on July 19, 1990. By way of emphasis, we concluded our Order with the following paragraph:

> 7. No continuances of the time deadlines set forth herein or of the hearings scheduled … shall be permitted, and this case may be dismissed if no plan can be confirmed on July 19, 1990.

On June 28, 1990, following appeals by the Debtors and Neumann from our Orders in *Fricker I, see Fricker II,* slip op. at 4–5, AAA filed an appeal to the district court from the Order of June 22, 1990. However, there was no response from the Debtors to this Order until they filed a cross-appeal and a request for a stay of the Order of June 22, 1990, pending appeal in the late afternoon of July 6, 1990, the very day that any amended Plan was to be filed. Since our Order of June 22, 1990, expressly indicated our desire to preclude any sort of delay and we did not wish the parties to have any doubt that the time-restrictions established in that Order would not be altered, we immediately denied that request. The Debtors took no further action until July 17, 1990, when they filed a Motion for Leave to Appeal Pursuant to Bankruptcy Rule 8003(c) and/or for Writ of Mandamus, and Stay Pending Review/Appeal, in the district court at C.A. No. 90–4334, which was assigned to the Honorable Clifford Scott Green.

No order was issued in that proceeding as of the morning of July 19, 1990, and, at the confirmation hearing, we were advised that Judge Green had scheduled a hearing on the motion at 4:00 P.M. that day. Accordingly, we proceeded with the confirmation/dismissal hearing scheduled in our Order of June 22, 1990, staying the entry of any Order until we learned, in the late afternoon, that Judge Green had taken the motion under advisement, presumably to wait to see whether our disposition would render that proceeding and all of the accompanying appeals moot.

Not having filed an Amended Plan, the Debtors, at the July 19, 1990, hearing, were forced to attempt to procure confirmation of their only Plan of Reorganization ever filed of record in the case, which had been filed on July 6, 1990. The terms of this Plan, which we find in several instances to be sufficiently vague as to cause us to be reluctant to paraphrase it, were as follows:

1. The future earnings of the debtor [sic] are submitted to the supervision and control of the trustee and the xxxxx-debtor's [sic] employer shall pay to the trustee the sum of $123.50 weekly—xxxxxxxxxxxxxx for a period of 60 months; *and, in addition the debtor shall pay to the trustee the sum of $425. per month starting with the 21st month and the continuing for 40 months thereafter.*

2. From the payments so received, the trustee shall make disbursements as follows:

> (a) Full payment in deferred cash payments of all claims entitled to priority under 11 U.S.C. § 507. (IRS to be paid concurrently with first mortgagee, see below)

> (b) Holders of allowed secured claims shall retain the liens securing such claims and shall be paid as follows:

> *Acceptance Associates of America—First Penna. Bank et al Assignees:*

> Assets of Brutus, Inc. to be sold pursuant to existing agreement of sale

with net cash proceeds after expenses of sale to be paid over to Acceptance Associates/Assignees and Acceptance Associates/Assignees to retain security interest in proceeds including installment obligation until allowed claim is paid in full from said proceeds.

*Payment to Internal Revenue Service ($8150 or allowed claim) and Meritor Savings Bank*

($25000 or allowed claim including interest on arrearages) to be paid concurrently from payments made to Trustee.

(c) Subsequent to [sic]—pro rata with dividends to secured creditors, dividends to unsecured creditors whose claims are duly allowed as follows:

Debts to SmithKline Employees Federal Credit Union (including amounts scheduled as secured and unsecured) are being paid outside plan through payroll withholding.

100% of allowed claims, other than payments due after the date on which the final payment under the plan are due, are to be paid under this plan, either from property of the estate or from payments made to trustee (emphasis in original).

Objections to this Plan were filed by AAA and Neumann, invoking 11 U.S.C. §§ 1325(a)(3), (a)(5), and (a)(6), which provide as follows:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

.    .    .    .    .

(3) the plan has been proposed in good faith and not by any means forbidden by law;

.    .    .    .    .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan. . . .

Most of the texts of the respective Objections were consumed with a litany of the alleged misdeeds of the Debtors' present counsel, David M. Still, Esquire, over the course of these proceedings. The most serious, chronicled in *Fricker II*, slip op. at 6–7, concerned the disposition of the Debtors' "escrow deposits" with their counsel during the course of this case which, in testimony in the adversary proceeding, the Debtors indicated were being saved to make current payments to Meritor. On May 8, 1990, after a series of efforts by the Debtors' counsel to evade this disclosure, *see id.*, it was discovered that, while the Debtors had deposited $21,087.88 with their counsel since the commencement of the case, part of which was paid to the trustee, the better part of it, *i.e.*, $12,474.72, was withdrawn by the Debtors' counsel for unapproved counsel fees and costs, and only $19.66 potentially payable to Meritor remained in escrow. *Id.*[1]

The Objectors also questioned whether the sale of the Debtors' business, Brutus, Inc. ("Brutus"), was an event which was likely to occur, as it had been in the offing but unconsummated since before the filing of this case on May 24, 1989.

However, the Debtors' counsel never filed the requisite fee application on July 6, 1990, presumably waiving this claim. When asked, at the hearing on July 19, 1990, whether he had refunded the fees illegally paid to him, he stated, without explanation or apology, that he had not refunded any because he believed himself entitled to it.

---

1. Because of counsel's receipt of fees in violation of Bankruptcy Rule ("B. Rule") 2002(a)(7) and Local Bankruptcy Rule 2002.2, we provided, in our Order of June 22, 1990, that the Debtors' counsel was obliged to file any motion for reasonable attorneys' fees pursuant to 41 P.S. § 407(b) on or before July 6, 1990, but that the fees awarded would be paid to the trustee to offset any fees retained by the Debtors' counsel.

The Standing Chapter 13 Trustee, Edward Sparkman, Esquire ("the Trustee"), also appeared at the July 19, 1990, hearing. The Trustee stated that the Debtors' payments due to him were current through only May, 1990. He also stated that, while the Plan contemplated payment of $49,000, the secured claims filed and not objected to by Meritor Savings Bank ("Meritor") (about $21,700), Smith Kline and French Federal Credit Union ("SKFFCU") (about $12,900), and the Internal Revenue Service ("IRS") (about $8,700), plus the $40,000 claim allowed in *Fricker II* to AAA, totalled over $83,000. He stated that his own projected commissions of ten (10%) percent of the amount paid would bring the amount necessary to pay all allowed secured claims to a figure of over $90,000. Therefore, in his vernacular, the plan was "not feasible."

The only witness at the hearing was the Wife–Debtor ("the Wife"). She testified that the Debtors were prepared to execute an agreement of sale of Brutus for $90,000 plus inventory on July 24, 1990. However, numerous contingencies in the consummation of the sale were admitted to exist, in addition to the fact that the execution of the agreement of sale itself had not occurred. Firstly, the buyers, whose financial means were completely unknown to her, were apparently obliged to obtain financing for over ninety (90%) percent of the price in order to consummate the sale. Secondly, settlement was targeted for 90 days after the signing of the agreement. Thirdly, the Wife had frequently testified that the sale of Brutus was imminent in the past, but no sale had in fact ever transpired.

The Wife testified that all payments to SKFFCU were being made through payroll deductions from her and her husband, as the Plan projected. We do note, however, that these payments, also as projected by the Plan, were being made on a small unsecured loan as well as on the Debtors' secured indebtedness to SKFFCU. With respect to the "concurrent" payments to Meritor and the IRS, the Wife testified that she had made sufficient payments to cover all of her obligations, including payments due to the Trustee under the Plan, to her counsel. The Trustee's ledger revealed payments to him of $5,063.50, which were made in two lump sums of $741 on August 7, 1989, and October 12, 1989, and a lump sum of $3,581.50 on April 6, 1990. As indicated at page 435 *supra,* the Debtors' counsel ultimately admitted that he was making remittances to himself from the account rather than paying Meritor or the IRS. However, the Wife expressed no dissatisfaction with these actions of counsel.

## C. A DESCRIPTION OF THE PROCESS OF CONFIRMATION OF CHAPTER 13 PLANS IN OUR COURT.

The first issue which presents itself is how the process of determining whether a plan should be confirmed is made by a bankruptcy court. In *In re Szostek,* 886 F.2d 1405, 1410–14 (3d Cir.1989), the Court of Appeals established that only the provisions of 11 U.S.C. § 1322(a) are mandatory, *i.e.,* these requirements must be satisfied if a plan is to be confirmed irrespective of any objection to confirmation by a creditor or the trustee.

■ The general procedure of this court in determining whether to confirm the vast majority of Chapter 13 plans is to rely upon the reports of the trustee to determine whether the plan fails to meet § 1322(a) or any other Code provision, whether the debtor is regularly making payments, and whether the plan contains sufficient funding to pay at least all allowed secured claims and the trustee's commissions. *See In re Hines,* 723 F.2d 333, 334 (3d Cir.1983) (court is justified in relying upon trustee's reports for establishing satisfaction of criteria for confirmation). This latter, "sufficient funding" requirement, although usually designated by the Trustee as addressing the "feasibility" of the plan, is in fact a checkpoint to determine whether the requirement of 11 U.S.C. § 1325(a)(5)(B)(ii) is satisfied. It is not a determination that the plan satisfies 11 U.S.C. § 1325(a)(6), which would normally be conceived as providing the "feasibility" requirement. If no objection by a creditor is filed or raised at the confirmation hearing and the trustee is prepared to execute his report in favor of

confirmation because the plan is feasible and payments are being made, we will typically confirm the plan as of course.

■ We do recognize, however, that the court "has an independent duty to determine whether the Plan is confirmable." *In re Gurst,* 76 B.R. 985, 989 (Bankr.E.D.Pa. 1987). Thus, while we do not have time to vigorously review all Chapter 13 plans for defects preventing confirmation which may have slipped past the Trustee, it is clear that, when we do find something amiss, we have the discretion not to confirm a Chapter 13 plan. This conclusion is consistent with *Szostek,* which holds that, while we have the discretion to overlook violations of Code sections such as § 1325(a)(5)(B)(ii), we also have the discretion to deny confirmation *sua sponte* if we uncover a violation of this or any other Code section and decline to confirm a plan on that basis.

D. THE ULTIMATE BURDEN OF PROVING THEIR ENTITLEMENT TO CONFIRMATION ORDERS IN THE FACE OF OBJECTIONS TO CONFIRMATION PURSUANT TO 11 U.S.C. §§ 1325(a)(3), (a)(5), AND (a)(6) RESTS UPON DEBTORS.

Our task becomes more difficult, but our duties are more clear-cut, when interested parties, such as the Trustee and, like here, creditors, come forward with objections to confirmation. If objections are filed or raised, we must give them full consideration and confirm a plan only if they are overcome. However, it is not clear what relative burdens the objector or the debtor must meet to resolve objections raised.

Judge Fox of this court has addressed the burden-of-proof issue as to the most common sort of objections to confirmation of Chapter 13 plans, *i.e.,* those arising under § 1325(b)(1)(B), at length in *In re Fries,* 68 B.R. 676, 683–85 (Bankr.E.D.Pa.1986). In *Fries,* Judge Fox concluded that the burden of producing evidence is upon the objecting party, but the ultimate burden of proving compliance of the plan with the provisions of § 1325(b)(1)(B) is upon the debtor. *Id.* In *In re Crompton,* 73 B.R. 800, 809 (Bankr.E.D.Pa.1987); and *In re*

*Gathright,* 67 B.R. 384, 391–92 n. 8 (Bankr. E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987), we concurred, at least in part. We agreed that the ultimate burden of proof in resolving such objections lay upon the debtor. However, we did suggest, in *Crompton, supra,* 73 B.R. at 809, that the creditor's pointing out "a situation which represents a clear abuse on its face" would be sufficient to meet its burden of production of evidence and cast the burden of ultimate persuasion upon the debtor.

■ One matter clear about § 1325(b)(1)(B) and not so clear about other confirmation requirements is that a § 1325(b)(1)(B) objection must be raised by the trustee or the holder of an allowed unsecured claim. Therefore, such a objection cannot be raised *sua sponte.* Consequently the trustee or an unsecured creditor must "produce" and articulate an objection under § 1325(b)(1)(B).

■ The difficult issue in our mind over such an objection is whether the creditor must do more to succeed if such an objection is contested by the debtor. That is, must that creditor produce a witness (usually the debtor) to succeed in meeting the burden of sustaining a § 1325(b)(1)(B) objection? We think not. We would therefore expand upon our *Crompton* statement and advise that we will consider and may grant a § 1325(b)(1)(B) objection if it appears reasonable even if no factual evidence is produced by the objecting party. Of course, we may deny such an objection without receiving any factual evidence if such an objection appears frivolous or unfounded. However, if the issue is close enough that we cannot decide it without testimony which is not forthcoming, we believe that we should refrain from confirming the plan rather than dismissing the objection. The debtor therefore should be present to defend against such an objection if the debtor wishes to alter the *status quo* of the absence of imposition of a Chapter 13 plan upon creditors through the process of confirmation. *See In re Wolff,* 22 B.R. 510, 512 (9th Cir. BAP 1982). Also, the debtor is the person with most access to proof as to his own budget and thus the

debtor is logically the party upon which such a burden should be placed. *See Crompton, supra,* 73 B.R. at 809. *See also, e.g., In re Jordan,* 91 B.R. 673, 684 (Bankr.E.D.Pa.1988); *In re New York City Shoes, Inc.,* 86 B.R. 420, 425 (Bankr.E.D. Pa.1988); and *In re Furlow,* 70 B.R. 973, 977–78 (Bankr.E.D.Pa.1987).

However, the instant objections to confirmation are not based upon § 1325(b)(1)(B), but upon §§ 1325(a)(3), (a)(5), and (a)(6). As Judge Fox indicates in *Fries, supra,* 68 B.R. at 684, the burdens of production and persuasion may vary depending on the type of objection to confirmation asserted. *See also In re Flick,* 14 B.R. 912, 914–15 & n. 7 (Bankr.E.D.Pa.1981). In *Flick,* Chief Judge Twardowski held that the creditor has the burden of producing evidence *and* the burden of persuasion in regard to the creditor's claim that the debtor was ineligible to file a Chapter 13 case under 11 U.S.C. § 109(e) and that he did not file his case "in good faith." 14 B.R. at 915.

■ We agree with *Flick*'s holding that a creditor has the burden of persuasion on the issue of whether a debtor is ineligible to proceed under Chapter 13 under 11 U.S.C. § 109(e). *See In re Rowe,* 110 B.R. 712, 717–18 (Bankr.E.D.Pa.1990). We also agree with *Flick*'s conclusion that there is no "good faith" requirement for *filing* a Chapter 13 case. 14 B.R. at 916. *See In re Taylor,* 96 B.R. 584, 591 (Bankr. E.D.Pa.1989); and *In re Ford,* 78 B.R. 729, 733 (Bankr.E.D.Pa.1987). However, the issues considered in *Flick* were challenges to the debtor's filing of his case, which we would not classify as objections to confirmation, as are in issue here. Objections to filing are, in effect, contentions that a case must be dismissed. Objections to confirmation require the less drastic relief of denial of confirmation, which can often be cured by amendment of a plan. Therefore, we would expect that the creditor would bear the burden of proving such contentions.

More analogous to the issues raised here are those which Chief Judge Twardowski considered in *In re Ziegler,* 88 B.R. 67, 69 (Bankr.E.D.Pa.1988). In *Ziegler,* a creditor raised an objection based on the failure of the debtor's plan to conform with 11 U.S.C. § 1322(b). In this context, Chief Judge Twardowski embraced the *Fries* analysis that "the initial burden of production falls on the creditor, with the ultimate burden of persuasion resting on the debtor." *Id.*

■ Consistently with *Ziegler,* we conclude that the burdens of proof on the issue of the objections of AAA and Neumann to the Debtors' plan, based upon §§ 1325(a)(3), (a)(5), and (a)(6), should be allocated much the same as in considering an objection based upon § 1325(b)(1)(B). The creditor has the initial burden of articulating a clear and cognizable objection. However, the debtor has the burden of ultimate persuasion, and is therefore obliged to make a record if such is necessary to persuade us to overrule the objection and confirm the plan in the face of such an objection. Moreover, we are empowered to raise §§ 1325(a)(3), (a)(5), or (a)(6) objections *sua sponte* at the confirmation hearings. As in the case of many § 1325(b)(1)(B) objections, we may be able to resolve many such objections without adducing any testimony. We would go further and state that we would grant the debtor a continuance as of course to meet any objection raised *sua sponte* or belatedly and/or orally.[2] However, if timely written objections are filed, the debtor acts at peril in not appearing to testify in support of confirmation at the confirmation hearing.

Therefore, in the instant case, where certain creditors and the Trustee have articulated rather plain objections to confirmation, the burden of producing evidence *and* of persuading us that we should confirm the instant Plan fell upon the Debtors.

**2.** Objections to confirmation can usually be timely raised by creditors in our court even as late as the confirmation hearing, because this court does not ordinarily fix a time within

which objections to confirmation must be filed, as we did in the Order of June 22, 1990, in this case. *See* B. Rule 3020(b)(1).

## E. THE DEBTORS HAVE NOT MET THEIR BURDEN OF OVERCOMING THE OBJECTIONS RAISED UNDER §§ 1325(a)(5), 1325(a)(6), OR 1325(a)(3).

### 1. § 1325(a)(5).

We first turn to the Trustee's objection, which we categorize as an objection under § 1325(a)(5). The Plan before us is clearly not sufficient to fund payment of all of the allowed secured claims filed in the case, making this objection *prima facie* valid.

The responses of the Debtor to this objection appeared to be as follows: (1) The SKFFCU obligation was to be paid outside of the Plan and therefore should not be considered; (2) The Debtors had appealed our determination that the AAA claim was as large as $40,000, and that claim might be eliminated entirely on appeal; and (3) The sale of Brutus would generate enough funds to pay all of the claims as filed in any event.

The first response falls in the face of 11 U.S.C. § 502(a), which states that a claim, as filed, "is deemed allowed" unless a party objects thereto. A plan provision which treats a claim in a certain fashion, such as paying it "outside the plan," *see In re Evans*, 66 B.R. 506, 509–10 (Bankr.E.D. Pa.1986), *aff'd*, 77 B.R. 457 (E.D.Pa.1987), is not the equivalent of an objection to that claim sufficient to permit it to be disallowed. Therefore, the SKFFCU secured claim must, at this juncture, be deemed allowed. Given the long period of pendency of this case and the nature of our Order of June 22, 1990, it is no answer for the Debtors' counsel to argue, as he did, that he easily *could* successfully object to the "allowability" of this claim. Not even the beginning of an attempt to object to this claim had been made as of July 19, 1990.

Regarding the second response of the Debtors, we note that AAA, as well as the Debtors and in fact prior to the Debtors, appealed our Order of June 22, 1990. *See* page 434 *supra*. Conceivably, the outcome of the cross-appeals could have resulted in a claim of AAA's being established at any figure between $94,517.70, its last amended claim as filed, plus additional interest, and zero. However, a bankruptcy court, given its mandate to a determine whether plans can be confirmed expeditiously, frequently cannot and will not allow appeals from determinations of objections to proofs of claims to halt its processes, unless of course a stay is requested and granted. We note that bankruptcy courts are authorized to go forward with confirmation, for the benefit of the debtor and all other creditors, even when final liquidation of a claim of a particular creditor is impossible, by allowing the estimation of claims. *See* 11 U.S.C. § 502(c). Here, we determined that a figure of $40,-000 was a just measure of AAA's claim after protracted hearings, a process much more intense than estimation. It may be that proceeding forward will render appeals from that determination moot. In any event, we would be equally as justified in requiring the Debtors to prepare a plan having a contingency fund of about $100,-000 to cover AAA's claim as we would be in valuing it at zero. We will do neither. Rather, we must proceed to confirmation, for the benefit of other creditors, on the assumption that our fixing of AAA's secured claim at $40,000 was correct.

The third response, which also touches on the § 1325(a)(6) requirement of feasibility, requires us to make a factual finding regarding the likelihood of a swift consummation of the sale of Brutus. We cannot conclude that the Debtors met their burden of convincing us that the sale of Brutus will actually take place imminently. Certainly since the sale of their home was scheduled in early 1989, and probably well before that time, the Debtors have known that the prompt sale of Brutus was crucial to resolving their financial problems. As early as July 27, 1989, at the hearing on AAA's motion for relief from the automatic stay, *see Fricker I*, 113 B.R. at 859, the Wife has been prognosticating the imminent sale of Brutus. However, because the Debtors are either unwilling or unable to bring this sale to a close, the sale of Brutus has never occurred. Nor is consummation necessarily imminent. The presently-identified prospective buyers must sign an

agreement of sale, get financing, and then go to settlement over a period which is unlikely to be completed much prior to November, 1990.

If this were the first in the series of promises of Brutus's imminent liquidation, we would be inclined to give the Debtors the benefit of the doubt. However, it is not. It is the latest in a series of equally optimistic promises of a quick sale. We therefore conclude that the imminent sale of Brutus is not a factor which we can realistically consider as "done" in the process of determining whether the requirements of § 1325(a)(5)(B) are met. Clearly, the alternative requirements of §§ 1325(a)(5)(A) and (C) are not satisfied. The Debtors' Plan therefore cannot be confirmed because they have failed to prove that it conforms to § 1325(a)(5).

2. § 1325(a)(6).

As we noted at page 439 *supra*, the prospect of imminent sale of Brutus is relevant to the issue of feasibility, per § 1325(a)(6), as the sale of Brutus is the centerpiece of the Debtors' Plan.

Generally, we do not consider the feasibility requirement of § 1325(a)(6) to be a difficult threshold to clear. We are quite willing to give Debtors the benefit of any reasonable doubt that they can perform according to the terms of their proposed Chapter 13 plan. *See In re Capodanno*, 94 B.R. 62, 64–65 (Bankr.E.D.Pa. 1988). *Cf. In re 222 Liberty Associates*, 108 B.R. 971, 985–87 (Bankr.E.D.Pa.1990) (Chapter 11 case involving 11 U.S.C. § 1129(a)(11)). We have recognized that poor pre-petition performances are not necessarily indicative of debtors' inability to perform when confronted with the discipline imposed upon them post-petition by Chapter 13 plans. *See Capodanno, supra,* 94 B.R. at 65.

However, the post-petition performances required by the Debtors under the instant Plan, in addition to the sale of Brutus, which we have deemed unlikely to occur, were maintenance of payments to Meritor and the IRS. These payments have not been maintained to date, and we

have no reason to expect that they will be maintained in the future.

A response suggested by the Wife but not pressed with vigor by the Debtors' counsel, for obvious reasons, is that the Debtors made payments to their counsel sufficient to cover the post-petition payments due to Meritor and the IRS, but counsel illegally siphoned these off to pay himself. We must, however, attribute the performance of the Debtors' counsel to the Debtors. *See, e.g., United States ex rel. O'Brien v. Maroney*, 423 F.2d 865, 869 (3d Cir.1970); *Gerhart v. Henry Disston & Sons, Inc.*, 290 F.2d 778, 789 (3d Cir.1961); and *In re Bradford*, 5 B.R. 18, 20 (Bankr. D.Nev.), *aff'd*, 6 B.R. 741 (D.Nev.1980). Certainly, we cannot conclude that the conduct of the Debtors' counsel is the responsibility of any *other* party. Furthermore, the Debtors have acquiesced and ratified their counsel's conduct by expressing no degree of dissatisfaction whatsoever to this conduct. We are not prepared to say, as the creditors suggested at the hearing of July 19, 1990, that the Debtors orchestrated their counsel's improprieties. However, on the other hand, we find no basis upon which to disassociate this conduct from the Debtors.

What we have before us is conclusive evidence that the Debtors have not made the post-payments contemplated by their Plan to Meritor or the IRS and have made little, if any, post-petition progress towards selling Brutus. In the face of such poor past *post-petition* performances, we cannot say that *future* post-petition performances of the Debtors are likely to be any better. We conclude that a plan dependent upon all of these performances is not feasible. The Debtors' Plan therefore cannot be confirmed on the ground that they have failed to meet the burden of proving that it satisfies the requirement set forth in § 1325(a)(6).

3. § 1325(a)(3).

Although we have consistently followed Chief Judge Twardowski's holding in *Flick* that there is no requirement that a

Chapter 13 case be *filed* in good faith, it is uncontestable that there *is* a requirement, set forth in § 1325(a)(3), that a Chapter 13 plan must be "proposed in good faith." We addressed the meaning of this requirement at length in *Gathright, supra.* Rejecting the broader view of this requirement envisioned by the many courts which have devised ever-larger laundry lists of objective criteria, *Gathright, supra,* 67 B.R. at 388–90, we stated, *id.* at 387–88, as follows:

> With Collier, we believe that "[t]he phrase 'good faith' as it appears in section 1325(a)(3) is entitled to its historical meaning" in the predecessor Bankruptcy Act, i.e., as relating solely to "debtor misconduct [in the bankruptcy proceeding], such as fraudulent misrepresentations or serious nondisclosures of material facts." 5 COLLIER ON BANKRUPT-CY, § 1325.04, at 1325–12, 1325–10 (15th ed. 1986). We conclude that nothing more should be read into the meaning of this Code provision.

We believe that what we have before us is an instance of what has been, in our experience, the relatively rare instance of a litany of post-petition debtor misconduct which brings § 1325(a)(3) into play. The most immediate example was the refusal of the Debtors to file an amended plan, pursuant to our Order of June 22, 1990. As a consequence, the Debtors were forced to "back in" to supporting a plan that we suspect that they were aware had been rendered obsolete by developments transpiring after it had been filed on July 6, 1989, ironically a year to the day that the amended plan was due under the Order of June 22, 1990. It is a breach of good faith, within the *Gathright* standard, to propose a plan for confirmation which a debtor knows is impractical. *Compare Evans, supra,* 66 B.R. at 508.

The Debtors' refusal to comply with the spirit of our Order of June 22, 1990, was aggravated by the fact that, throughout *Fricker II,* we warned the Debtors that their repeated failures to abide by the time-deadlines set forth in our procedural Orders could easily be interpreted as attempts to use the entire bankruptcy process strict-ly as a vehicle for delay. Slip op. at 6–7, 12, 44. We would assume that, if the Debtors were committed to proceeding in good faith, they would have taken every possible measure, after the June 22, 1990, Opinion, to prove that such an interpretation was mistaken. Instead, the Debtors proceeded to disregard the warnings contained in that Opinion and proceeded to act in such a way as to only confirm our worst fears about their motivations. While we recognize that their counsel were directly responsible for their actions, as we indicated at page 440 *supra,* we cannot separate the actions of the Debtors from those of their counsel in the instant circumstances.

The Debtors' failure to comply with the terms of the Plan, despite having the apparent financial ability to do so, also constitutes most disturbing improper post-petition conduct. The Plan called for concurrent payments to be made to Meritor and the IRS. The Debtors remitted sums to their counsel sufficient to maintain these payments, but counsel, on their behalf, chose to illegally divert these sums to payment of his own fees. Again, no corrective action was taken by the Debtors or their counsel in the face of our condemnation of this conduct in *Fricker II,* slip op. at 6–7, 43. Again, as we indicated at page 440 *supra,* we are compelled to attribute these improper and protested actions by the Debtors' counsel to the Debtors themselves.

Unfortunately, the improprieties recited in the last two paragraphs were not isolated. Others are noted in *Fricker I,* 113 B.R. at 859–60; and *Fricker II,* slip op. at 5–8. The filing of the motion in the district court on July 17, 1990, described at page 434 *supra,* rather than complying with our simplest of directives, is yet another manifestation of this pattern of conduct.

One other matter, the significance of which is dwarfed by the foregoing, also deserves brief mention. It was improper for the Debtors to continue paying their unsecured indebtedness to SKFFCU when they were not paying any other unsecured debts, thereby giving that creditor an un-

warranted preference. The Plan itself *provides* for this discriminatory treatment of similarly-situated general unsecured claims on its face, and no reasonable explanation for doing so was forthcoming. *See Furlow, supra,* 70 B.R. at 977–78. This factor may render the Plan unconfirmable under 11 U.S.C. §§ 1322(a)(3), (b)(1), and contributes to the conclusion that the Debtors have presented a plan which is significantly flawed. Presenting such a plan is improper post-petition misconduct. Consequently, the Debtors' Plan cannot be confirmed because they have failed to meet their burden of satisfying the "good faith" requirements of § 1325(a)(3) as well.

## F. WE HAVE THE POWER TO DISMISS THE DEBTORS' BANKRUPTCY CASE *SUA SPONTE,* AND WILL PROCEED TO DO SO.

█ In our Order of June 22, 1990, we warned the Debtors that a failure to obtain confirmation of a plan on July 19, 1990, might lead to dismissal of this case. Since the Debtors have made virtually no effort to comply with the letter or spirit of our Order of June 22, 1990, we can ascertain no just basis for throwing them out a lifeline.

█ We not only gave notice to the Debtors, but proceeded to display such an array of red flags to them that it could hardly have been clearer that the likely consequence of non-confirmance of their Plan would be dismissal of their bankruptcy case. Although no interested party had filed a motion to dismiss this case, we have little doubt that, in light of the 1984 amendments to 11 U.S.C. § 105(a), we are empowered to dismiss a bankruptcy case *sua sponte.* 2 COLLIER ON BANKRUPTCY, ¶ 1307.01[4], at 1307–7 to 1307–8 (15th ed. 1989). Numerous cases arising after the 1984 amendments have so concluded. *See In re Toibb,* 902 F.2d 14 (8th Cir.1990); *Finstrom v. Huisinga,* 101 B.R. 997, 998–99 (D.Minn.1989); and *In re Jephunneh Lawrence & Associates Chartered,* 63 B.R.

318, 321 (Bankr.D.D.C.1986). Moreover, even prior to the effective date of the 1984 amendments, numerous cases had upheld the inherent power of a bankruptcy court to dismiss cases before it when litigants disregard the court's directives. *See In re Ray,* 46 B.R. 424, 425–26 (S.D.Ga.1984); *In re Daily Corp.,* 72 B.R. 489 (Bankr.E.D.Pa. 1987); *In re Connelly,* 59 B.R. 421, 447–48 (Bankr.N.D.Ill.1986); and *In re Coram Graphic Arts,* 11 B.R. 641 (Bankr.E.D.N.Y. 1981). In *Jephunneh, supra,* 63 B.R. at 321, the court proceeded to dismiss a case *sua sponte* even in the absence of prior notice to any party.

The instant case presents the rare instance where this extraordinary power of this court must be exercised if the sanctity of our orders and the requirements of the Bankruptcy Code are to merit respect. As indicated at pages 440–441 *supra,* the Debtors, by their counsel, have proceeded in such a fashion as to convince us that they had filed and proceeded in this case in a convoluted and dilatory manner solely to further delay. Such actions are clearly indicative of "unreasonable delay" which is unfairly prejudicial to creditors, constituting a ground for dismissal under 11 U.S.C. § 1307(c)(1). Also, we have denied confirmation of the Debtor's Plan and will not, under the circumstances, give the Debtors additional time to file another plan or a modified plan. Thus, the case may be dismissed under 11 U.S.C. § 1307(c)(5).

We therefore do not doubt our power to consider dismissal of this case and conclude without hesitation that dismissal is appropriate. We note that the effect of this Order appears to render moot the numerous appeals from the Orders accompanying *Fricker I* and *Fricker II. See, e.g., In re Moseley,* 101 B.R. 608 (9th Cir. BAP 1989). We believe that the case must be kept open, however, to allow the Trustee to continue his pursuit of recovery of the compensation illegally retained by the Debtors' counsel.[3]

3. We express no opinion as to the effect of this disposition upon our Order of April 5, 1990, invalidating the sheriff's sale of April 19, 1989, of the Debtors' home. Among the warnings which we issued to the Debtors in *Fricker II,* slip op. at 44 n. 4, was that the continued vitality of this Order in the event of dismissal raised a "difficult question" under 11 U.S.C.

## G. CONCLUSION

An Order consistent with these conclusions will be entered.

### ORDER

AND NOW, this 26th day of July, 1990, upon considering testimony presented at a hearing of July 19, 1990, on the Objections of Acceptance Associates of America, Inc., Herman Neumann, and the Standing Chapter 13 Trustee, to confirmation of the Debtors' Plan of Reorganization filed on July 6, 1989; and, pursuant to the terms of our Order of June 22, 1990, to consider dismissal of this case, it is hereby ORDERED AND DECREED as follows:

1. The Objections are SUSTAINED and Confirmation of the Debtors' aforesaid Plan is DENIED on the ground that it violates 11 U.S.C. §§ 1325(a)(3), (a)(5), and (a)(6).

2. The Debtors' bankruptcy case is DISMISSED.

3. The Clerk shall nevertheless keep this case open pending further Order of this Court.

§§ 349(b)(1)(B), (C). However, we note that, since *Fricker I,* our analysis of 41 P.S. § 407(a) in that Opinion, 113 B.R. at 865, was approved by the Superior Court of Pennsylvania in *First National Bank of Allentown v. Koneski,* 392 Pa. Super. 533, 573 A.2d 591 (1990). It would thus appear that the state courts would agree with our conclusion that the sheriff's sale in issue must be set aside.